976 P.2d 427

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Ramon PEREZ, Defendant–Appellant.**

No. 20880.

Intermediate Court of Appeals of Hawai'i.

Oct. 23, 1998.

Certiorari Granted Nov. 20, 1998.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief for plaintiff-appellee.

Deborah L. Kim, Deputy Public Defender, on the briefs for defendant-appellant.

WATANABE, ACOBA, and KIRIMITSU, JJ.

ACOBA, J.

We hold that an instruction of the first circuit court (the court) which merely advised that "self-control" was a significant factor in determining whether the defendant was acting under the influence of extreme mental and emotional disturbance as described in Hawaiʻi Revised Statutes (HRS) § 707–702(2) (1993) at the time he attempted to commit murder unduly singled out that factor for consideration by the jury. We hold, further, that the court's adoption of an instruction notifying the jury that it might convict a defendant if it was "firmly convinced" of the defendant's guilt, indicated that the defendant might be convicted on less than proof of guilt beyond a reasonable doubt, and therefore failed to adequately convey the concept of reasonable doubt to the jury. We do not see error in the other points raised by Defendant–Appellant Roman Perez (Defendant).

I.

A.

On July 30, 1996, Defendant was charged in an eight-count indictment with the following offenses: Counts I & II, Attempted Murder in the Second Degree, HRS §§ 705–500

(1993),[1] 707–701.5(1) (1993),[2] and 706–656 (Supp.1996),[3] of Nova Perez (Nova) and Robert Ilae (Ilae), respectively; Counts III–V, Reckless Endangering in the First Degree, HRS § 707–713 (1993),[4] of Eric Nakashima (Nakashima), Anthony Rivera (Rivera), and Ronald Buckingham (Buckingham), respectively; Count VI, Place to Keep Pistol or Revolver, HRS §§ 134–6(c) and (e) (Supp. 1994); Count VII, Possession of a Firearm by a Person Convicted of Certain Crimes, HRS §§ 134–7(b) and (h) (Supp.1994); and Count VIII, Possession of Ammunition by a Person Convicted of Certain Crimes, HRS §§ 134–7(b) and (h). At a change of plea hearing held prior to the commencement of trial, Defendant entered guilty pleas to Counts VI–VIII, therefore those counts are not subjects of the instant appeal. The case proceeded to trial on the remaining counts.

### B.

While our decision largely focuses on the instructions given to the jury, we believe a recitation of the material facts places those instructions in relevant context.

Defendant and Nova were married in 1988. At the time of trial, Defendant was sixty-six years old and Nova was thirty-two years old. Defendant would sign his paycheck, which he earned working as a janitor, to the order of Nova. Nova was responsible for paying the household bills.

Nova worked at the Hawai'i Newspaper Agency (HNA). She testified that in May 1996 she met "Nani," who worked as a security guard at HNA. The two became close friends and by the end of May and early June 1996, their friendship developed into a romantic relationship. Nova began spending nights at Nani's home. Defendant testified that sometime in May, he realized that Nani had become Nova's girlfriend.

Nova was hospitalized following a car accident. When Defendant visited Nova, he found her asleep but holding a letter which Defendant thought might be a note for him. Defendant read the letter and discovered it was a love letter from Nani. Defendant was aware that Nova had had lesbian relationships in the past, but did not discover until sometime around late 1995 and early 1996, that Nova had renewed such relationships. He told Nova, "Baby, ... if you find one chick [sic], you can go with 'em [sic]. All I want is you come home [sic]."

Around the end of June, Nova told Defendant she wanted to move in with Nani. Although Nova thereafter lived with Nani, she and Defendant still had sexual relations. Defendant repeatedly asked Nova to stay the night, but she would reject him, saying,

---

1. Hawai'i Revised Statutes (HRS) § 705–500 (1993) states:

   **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
   (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
   (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
   (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
   (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 707–701.5(1) (1993) states, in part, that "[e]xcept as provided in section 707–701 [defining murder in the first degree], a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

3. HRS § 706–656(a) (Supp.1996), in relevant part, mandates that "persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole...."

4. HRS § 707–713(1) (1993) states:

   A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.

"Oh[,] maybe one of these days." Nova testified that during the week before the subject incident, Defendant told her that "a person could only take so much before they [sic] snap." He told Nova that "he was not afraid to die, and that one day he was going to do something that she would remember for the rest of her life." Defendant testified he envisioned shooting himself in front of Nova.

Nova related that on Thursday, July 25, 1996, the day before the incident, she went to Defendant's home to check on him. According to Nova, Defendant looked "different, more quiet[,]" and appeared to be "kind of fed up" with asking Nova to come home. That evening, while Nova was at a party with her co-workers, Defendant paged her three or four times, but Nova did not respond because she knew he was upset.

Defendant testified that after taking him to cash his check on the Monday before the incident, Nova asked Defendant for money. He asked Nova about the balance in their joint bank account and she told him there was $300 in the account. He gave her $100, but told her that he needed it returned so he could pay the rent. However, Nova did not come by with the money.

On Thursday, Defendant went to the bank to withdraw money from the account but learned that there were only six dollars and seventy some cents in the account. Defendant was surprised and angry at this. That night, he repeatedly tried to contact Nova and his anger grew because she would not answer his calls.

Nova testified that at about 10:30 a.m. on Friday, July 26, 1996, she left work to purchase lunches for herself and others. As she walked back to work, she saw Defendant across the street from her. Defendant called out to Nova but "something" made Nova continue walking. Nova headed down South Street toward the "K & Y" auto service station located on the corner of South and Queen Streets, but Defendant followed her. When she turned to look at Defendant, she saw him point a gun at her. Nova ran into the street intersection to escape.

While in the intersection, Nova heard a gunshot and stumbled to her knees. She looked down and saw a small red spot on her shirt, and felt a warm, burning sensation on her right side. Nova stood up and ran towards the station. She heard a second shot and felt something graze her hair. When she reached the station, she cried out for help.

Nova ran to a wall at the rear of the station and tried to climb over it. Two station workers, Rivera and Mitch Martin, jumped over the wall and tried to pull her over. Nova heard more shots. Because she was unsuccessful in scaling the wall, she ran to the car wash area of the station. Rivera testified that he tried to pull Nova over the wall, but pushed her back down towards the car wash area because she was a "prime target". Rivera dropped down behind the wall and heard a gun shot.

Nova then ran onto South Street, attempting to stop anyone in a vehicle who would take her away. She succeeded in stopping a tow truck driven by Buckingham. She walked around to the passenger side of the truck, opened the door, and got in. Nova told Buckingham that she had just been shot and asked him to take her to the police station. When he heard a gun shot, Buckingham "took off" down Queen Street.

Defendant testified that he did not sleep on the night before the incident. Thoughts of Nova kept going through his mind. The next day, he planned to go to Nova's work place to talk to her, then to kill himself in front of her. Defendant caught the bus to HNA, with Nova's gun in his pants pocket. Defendant saw Nova's car. He sat down to wait for Nova, believing she had to come out for either lunch or to "feed" the parking meter.

He caught sight of Nova as she walked down the street. Defendant said, "Baby, I getting tired. Stop. I like talk to you [sic]." He took the gun out of his pocket and shot low and to the side of Nova. He did not know that Nova had been hit by the bullet. Defendant crossed Queen Street and was standing across the street from the station when he fired a second shot to the side of Nova.

At this point, Defendant further testified that he crossed the street to the service

station and lost sight of Nova. He walked past the pumps, mumbling that he did not know why this was happening and he didn't want to hurt anyone.

When Defendant saw that Nova was boarding a tow truck, he fired another shot. Defendant testified that he wanted Nova to stop because he thought he would not be able to talk to her if she left in the truck.

When the truck drove away, Defendant walked back to Nova's car and sat in it. Two police officers came up, blocking the car, and told Defendant to drop his gun. Defendant put the gun to his head and pulled the trigger. When nothing happened, he pulled the trigger again, but the gun did not fire. Defendant exited the car, calling out for the police to shoot him, but they would not do so. Defendant then walked down Kawaihao Street and through the HNA parking lot where the police lost sight of him. Defendant was asking an HNA employee for a ride when he was apprehended by the police.

### C.

On February 10, 1997, the jury found Defendant guilty as charged with respect to Counts I, III, and V, guilty of the included offense of Attempted Assault in the First Degree with respect to Count II, and not guilty as to Count IV. On July 10, 1997, Defendant was sentenced to imprisonment for life with the possibility of parole on Count I, prison terms of ten years on Count II, and five years each on Counts III and V, with mandatory minimum terms of twenty years on Count I, ten years on Count II, and five years each on Counts III and V for the use of a semi-automatic firearm.

5.  We note that the first circuit court (the court) did not renumber the proposed instructions to coincide with the order in which they were read to the jury. Accordingly, we must refer to the number assigned the instructions as proposed instructions. We refer to the court's proposed instruction No. 33 as Instruction 33.

6.  We refer to the State's proposed instruction No. 3 as Instruction 3.

7.  We refer to the court's proposed instruction No. 2A as Instruction 2A.

8.  The entire instruction was as follows:

On August 1, 1997, Defendant appealed. He claims the following errors:

(1) Jury instruction No. 33 (Instruction 33)[5] did not accurately define the state of mind required for the commission of attempted second degree murder;

(2) Jury instruction No. 3 (Instruction 3)[6] amounted to an impermissible comment by the court on the evidence regarding extreme mental or emotional disturbance and Defendant was substantially prejudiced by it;

(3) Jury instruction No. 2A (Instruction 2A)[7] was an erroneous definition of proof beyond a reasonable doubt; and

(4) The court erred in failing to admonish the prosecutor or to issue curative instructions when Plaintiff–Appellee State of Hawai'i (the State) purportedly raised the issue of Defendant's punishment in its closing argument.

Defendant's challenge to Instructions 3 and 33 relate to the charge of attempted murder in Count I. His dispute with Instruction 2A, as may be readily ascertained, affects his convictions on all counts. We examine the claimed errors *in seriatim*.

### II.

### A.

Instruction 33 concerned Defendant's required state of mind for the attempt offense. That part of the instruction, based on HRS §§ 705–500 and 707–701.5 and relevant to our review, stated that "Defendant engaged in conduct which, under the circumstances as he believed them to be, was a substantial step in a course of conduct *intended or known to cause the death* of [Nova]."[8] (Em-

In Count I of the Indictment, ... Defendant [–Appellant Roman Perez (Defendant)] is charged with the offense of Attempted Murder in the Second Degree as to Nova Perez [(Nova)].

A person commits the offense of Attempted Murder in the Second Degree if he [or she] intentionally engages in conduct which, under the circumstances as he [or she] believes them to be, is a substantial step in a course of conduct intended or known to cause the death of another person.

There are two material elements to this offense, each of which the prosecution must prove beyond a reasonable doubt.

phasis added). The instruction was given by agreement.[9] Hence, the State asserts that Defendant failed to preserve the challenge to this instruction for our review. "Ordinarily, instructions to which no objection was made at trial may not be raised as error on appeal." *State v. Pinero*, 75 Haw. 282, 291, 859 P.2d 1369, 1374 (1993).

■ However, as the State acknowledges, we may notice plain error under Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b), if we believe any instruction is erroneous and affected Defendant's substantial rights. *State v. Toro*, 77 Hawai'i 340, 347, 884 P.2d 403, 410 (App.1994) ("Under [HRPP] Rule 52(a), any error which does not affect Defendant's substantial rights shall be disregarded. Conversely, [under HRPP Rule 52(b),] where Defendant's substantial rights are affected, there is reversible error." (internal quotation marks, brackets, ellipses, and citations omitted)).

**B.**

■ Defendant contends that the instruction must specifically state that the conduct was known *by Defendant* to cause the proscribed result because under HRS § 705–500, a defendant must subjectively possess the requisite intent or knowledge.[10] Accordingly, he argues, the instruction was "prejudicially flawed since the use of the term 'known' was ambiguous and prejudicially misleading [because, a]s worded, the instruction improperly permitted the jury to apply an *objective* standard in determining whether Defendant's conduct was a substantial step in a course of conduct 'known' to cause [Nova's] death." (Emphasis added).

It seems the court employed a modified version of Hawai'i Standard Jury Instructions Criminal (HAWJIC) 14.04 (West 1997) in instructing the jury.[11] Defendant instead urges that HAWJIC 14.02A should have

---

These two elements are:

1. That on or about the 26th day of July, 1996, on the island of Oahu, City and County of Honolulu, State of [Hawai'i], ... Defendant engaged in conduct which, under the circumstances as he believed them to be, was a substantial step in a course of conduct intended or known to cause the death of [Nova]; and

2. That ... Defendant did so intentionally. Conduct shall not be considered a substantial step unless it is strongly corroborative of ... Defendant's intent to commit Murder in the Second Degree. A person commits Murder in the Second Degree when he [or she] intentionally or knowingly causes the death of another person.

[Hawai'i Jury Instructions Criminal (HAWJIC)] 14.03 MODIFIED; HRS § 705–500, 707–701–5 & 706–656.

9. We note that Defendant, in his briefs, did not raise a point of error with respect to the court's proposed instruction No. 40, the instruction issued on the charge of Attempted Murder in the Second Degree of Robert Ilae, Jr., apparently because Defendant was convicted of a lesser-included offense on this charge. We observe that proposed instruction No. 40 is virtually identical to Instruction 33, except for the substitution of Robert Ilae's name for that of Nova. Defendant's claim that Instruction 33 did not adequately set forth the required state of mind for Attempted Murder in the Second Degree would likewise apply to proposed instruction No. 40.

10. *See* HRS § 705–500(2) quoted in *supra* note 1.

11. The court apparently erroneously indicated that it derived Instruction 33 from a modified version of Hawai'i Pattern Jury Instructions Criminal (HAWJIC) 14.03 entitled, "Attempt— Substantial Step: Particular Result is Element of Crime." Instead, it appears that the court utilized a modified version of HAWJIC 14.04 when it instructed the jury. HAWJIC 14.04 (West 1997) states, in relevant part:

A person commits the offense of Attempted *(specify substantive offense)* if, with the intent to commit *(specify substantive offense)*, he/she intentionally engages in conduct which constitutes a substantial step in a course of conduct intended or known to cause *(specify result of conduct which is an element of the substantive offense)*.

There are two material elements of the offense of Attempted *(specify substantive offense)*, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about *(date)* in the [City and] County of *(name of county)*, the Defendant intended to commit *(specify substantive offense)*; and

2. That the Defendant intentionally engaged in conduct which was a substantial step in a course of conduct intended or known to cause *(specify result of conduct which is an element of the substantive offense)*.

Conduct shall not be considered a substantial step unless it is strongly corroborative of the Defendant's intent to commit *(specify substantive offense)*. ...

been given.[12] HAWJIC 14.02A (West 1997) states, in relevant part, that "the conduct . . . was a substantial step in a course of conduct intended or known to be practically certain *by the Defendant* to cause the death of another person." (Emphasis added.)

The State argues, however, that "implicit in the language of [Instruction 33] is that Defendant's conduct was intended or known by him to cause Nova's death." It relies on *State v. Moore*, 82 Hawai'i 202, 921 P.2d 122 (1996), where the defendant, Moore, appealed the trial court's denial of his motion to dismiss a complaint charging him with attempted murder in the second degree. The complaint against Moore stated, in relevant part, the following:

> Moore did intentionally engage in conduct which is a *substantial step in the course of conduct intended or known to cause the death* of [the .victim], thereby committing the offense of Attempted Murder in the Second Degree in violation of Section[s] 705–500, 707–701.5 and 706–656 of the [Hawai'i] Revised Statutes.

*Id.* at 207, 921 P.2d at 127 (footnotes omitted) (emphasis added). Specifically, it appears Moore argued that the complaint omitted the intent element of attempted second degree murder, because it did not directly allege that *the defendant* intended to kill the victim. *Id.* at 216, 921 P.2d at 136. In rejecting Moore's contention, the Hawai'i Supreme Court reasoned that "[a]lthough the phrase 'intended or known' describes the conduct, implicit in the sentence is that the conduct

was intended or known *by Moore*, the subject of the sentence, to cause the death of [the victim][,]" and "[t]he fact that the intent ·to kill [the victim] was alleged indirectly does not render the complaint defective[.]" *Id.* (emphasis in original). Ultimately, then, "[a] person of common understanding . . . would understand that the nature of the accusation was that Moore intended to cause the death of [the victim]." *Id.*

While *Moore* involved the sufficiency of a complaint and Defendant challenges the sufficiency of a jury instruction, we find the reasoning in *Moore* persuasive. The supreme court expressly rejected the notion that an attempt charge was insufficient absent specific language that "the conduct was intended or known *by [the defendant]*, the subject of the sentence, to cause the death of [the victim]." *Id.* (emphasis in original). Consequently, we believe that implicit in Instruction 33 to persons of "common understanding," including jurors, was that Defendant, the subject of the sentence, must have engaged in the conduct with the stated belief.

■ While we do not find reversible error in the court's use of modified HAWJIC 14.04 in light of *Moore*, we note that HAWJIC 14.02A, *see supra* note 12, would leave no doubt as to the requisite state of mind for the crime of attempted murder in the second degree and is clearly to be preferred in instructing the jury with respect to that offense.

---

12. HAWJIC 14.02A (West 1997) entitled, "Attempted Murder Second Degree—Purpose to Cause Proscribed Result: H.R.S. §§ 705–500(2) and (3), 707–701.5," provides as follows:

> [In Count *(count number)* of the Indictment/Complaint, the] [The] Defendant, *(defendant's name)*, is charged with the offense of Attempted Murder in the Second Degree.
> A person commits the offense of Attempted Murder in the Second Degree if he/she intentionally engages in conduct which, under the circumstances as he/she believes them to be, is a substantial step in a course of conduct intended or known to cause the death of another person.
> There are two material elements of the offense of Attempted Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

> These two elements are:
> 1. That on or about (date) in the [City and] and County of (name of county), the Defendant intentionally engaged in conduct; and
> 2. That the conduct, under the circumstances as Defendant believed them to be, was a substantial step in a **course of conduct intended or known to be practically certain by the Defendant to cause the death** of another person.
> Conduct shall not be considered a substantial step unless it is strongly corroborative of the Defendant's intent to commit Murder in the Second Degree, which is, intentionally or knowingly causing the death of another person.
> (Boldfaced emphasis added.)

### III.

#### A.

Instruction 3 informed the jury that the presence or absence of "self-control ... is a significant factor" in determining whether Defendant should be afforded the defense of extreme mental and emotional disturbance (the emotional disturbance defense) in reducing the attempted murder charges. The emotional disturbance defense, which reduces the offense of murder to that of manslaughter, is set forth in HRS § 707–702(2):

> In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, *under the influence of extreme mental or emotional disturbance* for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

(Emphasis added.) Recently, the Hawai'i Supreme Court has indicated that "HRS § 707–702(2) provides a special *defense* idiosyncratic to a charge of murder that mitigates a defendant's culpability for murder by diminishing his penal liability for the offense." *Whiting v. State*, 88 Hawai'i 356, 361, 966 P.2d 1082, 1087 (1998) (emphasis in original).

Defendant raised the defense in HRS § 707–702(2) to reduce his criminal liability on Counts I and II to "attempted manslaughter" based upon extreme mental or emotional disturbance. Generally, "there can be no offense of 'attempted manslaughter[.]'" *State v. Holbron*, 80 Hawai'i 27, 45, 904 P.2d 912, 930, *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995). However, the Hawai'i Supreme Court has held that "a defendant charged with attempted murder, in violation of HRS §§ 705–500 and 707–701.5, may be convicted of attempted manslaughter, in violation of HRS §§ 705–500 and 707–702(2), by virtue of 'extreme mental or emotional disturbance for which there *is* a reasonable explanation.'" *Id.* Accordingly, Defendant can "'rely on the defense of extreme mental or emotional disturbance afforded by HRS § 707–702(2)[.]'" *Id.* (quoting *State v. Nizam*, 7 Haw.App. 402, 410, 771 P.2d 899, 904, *reconsideration denied*, 7 Haw.App. 668, 807 P.2d 54, *cert. denied*, 70 Haw. 666, 796 P.2d 502 (1989)).

Instruction 3 read as follows:

> The question of [Defendant's] self-control, or the lack of it, at the time of the offense, is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance. *State v. Matias*, 74 Haw. 197, 204[, 840 P.2d 374, 378] (1992).

This instruction was given over Defendant's objection that it was "a comment to [sic] the evidence." In overruling the objection, the court responded that while "[it] used to think that [Instruction 3] shouldn't come in, ... [the court] think[s] it would help the jury."

Defendant maintains that Instruction 3 is "prejudicially misleading" because (1) "[t]he instruction focused on the presence or absence of self-control without providing the jury with proper guidance on [its] relevance ... to" the emotional disturbance defense, (2) unlike *Matias*, there was no expert testimony in the instant case concerning self-control, thus leaving the jury "to improperly speculate as to what constituted[,] and the significance of[,] 'self-control,'" and (3) the word "significant" in the instruction was an "improper comment on the evidence."

The State, on the other hand, points out that the Hawai'i Supreme Court has said, "The applicable case law leaves no doubt that the question of a killer's self-control, or lack of it, at the time of the killing is a significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance[.]" *Matias*, 74 Haw. at 204, 840 P.2d at 378.

#### B.

We note that *Matias* did not involve any question concerning the appropriate instructions to be given under HRS § 707–702. The issue there was whether a psychologist's testimony on the defendant's self-control was properly admitted. *Id.* at 203, 840 P.2d at 377. Matias, the defendant, was convicted of

murder in the second degree. *Id.* at 199, 840 P.2d at 375. At trial, he had argued that "at most [he was] guilty of manslaughter," because, at the time of the crime, he was "under the influence of an extreme emotional disturbance for which there was a reasonable explanation." *Id.* The prosecution called a psychologist as an expert witness, who testified that "there [was] no extreme emotion [and] self-control was intact[.]" *Id.* at 201, 840 P.2d at 377.

On appeal, the defendant "contend[ed] that 1) because [the psychologist's] testimony focused on the question of Matias' self-control at the time of the killing, [his] opinion was irrelevant and prejudicially misleading; and 2) the trial court should have refused to admit [the psychologist's] opinion." *Id.* at 203, 840 P.2d at 377. The supreme court concluded that the defendant was "manifestly mistaken in arguing that the question of self-control on the part of the killer is not relevant to the issue of whether a murder should be mitigated to manslaughter[.]" *Id.* at 206, 840 P.2d at 378.

· In doing so, it cited to language in *State v. Dumlao,* 6 Haw.App. 173, 715 P.2d 822, *cert. denied,* 68 Haw. 692, 715 P.2d 822 (1986), *State v. Russo,* 69 Haw. 72, 734 P.2d 156 (1987), and *State v. Pinero,* 70 Haw. 509, 778 P.2d 704 (1989), characterizing the defense in HRS § 707–702(2) as involving a loss of self-control. In *Dumlao,* this court indicated that "[extreme mental and emotional] disturbance was meant to be understood *in relative terms as referring to* a loss of self[-]control due to intense feelings." *Dumlao,* 6 Haw.App. at 180, 715 P.2d at 828 (emphasis

added). *Russo* did not further define the requisite extent of the disturbance but traced its roots to common law *manslaughter,* which was defined in the ancient case of *The King v. Greenwell,* 1 Haw. 85[146], 87[149] (1853), as springing from " 'passion ... tending to disturb the judgment and mental faculties, and weaken the possession of self-control[.]' " *Russo,* 69 Haw. at 77, 734 P.2d at 159 (emphasis added) (quoting *Greenwell,* 1 Haw. at 87[149] ). In *Pinero,* the supreme court likened the defense in HRS § 707–702(2) to " 'voluntary manslaughter [because it] involves ... emotional disturbance ... causing a temporary loss of normal self-control.' " *Pinero,* 70 Haw. at 524, 778 P.2d at 714 (quoting W.R. LaFave & A. Scott, Jr., *Criminal Law* § 76, at 573 (1972) (footnote omitted)).

None of these cases touched on whether the presence or absence of self-control should be referred to in an instruction already setting forth the defense as laid out in HRS § 707–702(2). In *Dumlao,* this court remanded the case for a new trial, "holding ... that the trial court was required to instruct the jury as requested by Dumlao." *Dumlao,* 6 Haw.App. at 184, 715 P.2d at 830. The instruction requested by Dumlao reiterated the language in HRS § 707–702(2) [13]. *Id.* The relevant portion of that instruction is similar to the instruction in HAWJIC 5.02, referred to in *Whiting.* [14] In *Russo,* as in *Dumlao,* the instruction was similar to the language of HRS § 707–702(2), but was not discussed because the supreme court determined there was no evidence to support the giving of such an instruction. *Russo,* 69

---

13. In *State v. Dumlao,* 6 Haw.App. 173, 715 P.2d 822, *cert. denied,* 68 Haw. 692, 715 P.2d 822 (1986), "the proffered instruction read[, in pertinent part,] as follows":

(2) In a prosecution for murder it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

*Id.* at 175 n. 4, 715 P.2d at 825 n. 4.

14. In *Whiting v. State,* 88 Hawai'i 356, 362 n. 5, 966 P.2d 1082, 1088, n. 5 (1998), the Hawai'i Supreme Court quoted from HAWJIC 5.02 which stated, in relevant part:

If and only if you find, beyond a reasonable doubt, that the defendant intentionally or knowingly caused the death of [decedent] [and that he/she was not justified in using deadly force], you must then determine whether, at that time, the defendant was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances of which the defendant was aware or as the defendant believed them to be.

Haw. at 75 n. 4, 734 P.2d at 158 n. 4. *Matias* did not discuss or set out the instruction "on the manslaughter mitigation defense under HRS § 707–702(2)." *Matias*, 74 Haw. at 202, 840 P.2d at 377. Rather, the supreme court concluded that the "extensive testimony [of the expert witness] on the core issue of self-control *as it relates* to the extreme emotional disturbance component of HRS § 707–702(2)" constituted substantial evidence supporting the guilty verdict. *Id.* at 209, 840 P.2d at 380 (emphasis added).

It is evident from the foregoing cases and from the Hawai‘i Penal Code Commentary that the concept of lack of self-control as derived from common-law manslaughter is already subsumed in the penal code defense of emotional disturbance:

> The reduction of murder to manslaughter, when mitigating mental or emotional disturbances are present, appears in the Model Penal Code and most recent state revisions. This reduction is a clarification of the common law on the subject. The Code adopts this approach in subsection (2) [which relates to the emotional disturbance defense].
>
> . . . .
>
> The case law of Hawai‘i contains the typical common-law provision for the reduction of murder in the first or second degree to manslaughter when mitigating mental or emotional disturbances are present. Reduction of the offense for killing in the "heat of passion" has been recognized and *something approximating the Code's more general approach to mental and emotional extenuation had been accepted as early as 1853:*
>
> > Whoever kills another . . . under the sudden impulse of passion . . . of a nature tending to disturb the judgment and mental · faculties, *and weaken the possession of self-control* of the killing party, is not guilty of murder, but manslaughter.
>
> The criterion of a general weakening of self-control was quite an advanced and liberal approach for 1853. However, there were the additional requirements that the killing be without malice and that the passion be provoked or caused by the victim.

Such additional requirements tended to subvert the otherwise liberal approach.

Commentary on HRS § 707–702 (footnotes omitted) (emphases added). Hence, the "criterion of a general weakening of self[-]control" seen as "an advanced and liberal approach for 1853," was not the same as but rather "something approximating the Code's [already] *more general approach to mental and emotional extenuation.*" *Id.* (emphasis added).

### C.

■ In light of the "more general approach" of the defense as compared to "the [early] criterion of a general weakening of self[-]control," we believe that the language of Instruction 3 was conceptually too narrow, and thus insufficient in informing the jury of the role of "self-control" under the penal code formulation of the defense. The instruction could thus be, and in fact was used by the prosecution in closing argument to unduly limit the scope of the defense. In effect, the State argued to the jury that if Defendant was capable of committing the acts charged, he possessed sufficient self-control to disqualify him from invoking the emotional disturbance defense:

> What does it mean to be under the influence of an extreme mental or emotional disturbance? . . . You got to be under the influence of an extreme mental or emotional disturbance. But again, what does that mean?
>
> All right. That's just words. It's difficult. You're going to get a definition to help you.
>
> *The question of [Defendant's] self-control, okay, his self-control, or the lack of it, at the time of the offense. [sic] At the time of the offense—so in this case it would be at the time he's doing all that shooting—is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance.* So the key is this (indicating). Okay.
>
> Now, if you find that he was under self-control, that he had self-control, *that he had control of himself while he's doing this stuff, then he's not under the influence of*

*extreme mental or emotional disturbance. That's what it means.*

. . . .

Every witness who testifies to his conduct says he was calm. He never even breaks into a run. Is he yelling and screaming out of his head, swearing at her? No, he's not saying anything. The most that [Nakashima] said is he heard his maybe mumbling something, but the other witnesses say he wasn't saying anything. . . .
*He's totally in control of that situation. He's got the gun and he's certainly not— he certainly hasn't lost any control over himself.*

. . . .

. [I]f you believe the State's evidence and you believe the State's case and *you believe, for example, that he was under control of himself through this incident, that's enough. That's proof beyond a reasonable doubt that he was not under the influence of extreme mental or emotional disturbance during the shooting.*

(Emphases added.) However, the emotional disturbance defense *admits* that the defendant intentionally or knowingly caused the death of another or attempted to do so, and therefore, that the defendant possessed the requisite "self-control" to commit or attempt murder. Commission of such acts is, in effect, the factual and legal prerequisite for raising such a defense, and thus not the basis for defeating it. As the defense argues, "[i]f this [ (self-control in committing the acts) ] were the criteria for assessing [the emotional disturbance defense,] then no defendant would be entitled to [its] benefit . . . since the mitigation presumes the wherewithal to have committed a murder." The question is not whether the defendant had sufficient self-

control at the time to commit murder or to attempt it, but whether, when the acts were committed, the defendant was *influenced* by the requisite mental and emotional disturbance.

As Defendant indicates, he does not dispute the relevance of "all aspects of a defendant's conduct," but that the prejudice inherent in the instruction was the failure to provide "any . . . explanation [of] . . . 'self[-]control' " as it related to the defense. We believe that an instruction which merely singles out "self-control" for consideration by the jury is prejudicially insufficient and misleading.[15]

### D.

■ We see little to be accomplished, then, in adding an instruction on "self-control" to a standard instruction which already embodies the principle that the "weakening of self-control" is "approximat[ed]" in the extenuating circumstances of mental and emotional disturbance referred to in HRS § 707–702(2). Moreover, the solitary reference to self-control may only tend to mislead or confuse the jury, since the emotional disturbance defense was intended to be "more general" and hence broader in its application than common law manslaughter. Commentary on HRS § 707–702; *Dumlao*, 6 Haw. App. at 184, 715 P.2d at 830. Finally, and in any event, we do not discern in Instruction 3 language which would guide the jury on how self-control "relates to the extreme emotional disturbance component of HRS § 707–702(2)." *Matias*, 74 Haw. at 209, 840 P.2d at 380. Consequently, we conclude that Instruction 3 was prejudicially erroneous. *See* HRPP Rule 52(b).

15. In *State v. Seguritan*, 70 Haw. 173, 766 P.2d 128 (1988), the Hawai'i Supreme Court impliedly approved that part of an instruction which related loss of self-control to an "extreme emotional reaction" and "reason . . . overborne by intense feelings[.]" *Id.* at 174, 766 P.2d at 128. There, the trial court had issued the following instruction with respect to the defense of extreme mental or emotional disturbance:

The term "extreme mental or emotional disturbance" as used in the Manslaughter defense denotes the emotional state of an individual

who 1) is exposed to an extremely unusual and overwhelming stress, and 2) has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.
*Id.* at 173–74, 766 P.2d at 128. The supreme court indicated, "The problem we have with the instruction, as given, is with subsection (1)," impliedly approving the second part of the instruction. *Id.* at 174, 766 P.2d at 129.

IV.

Instruction 2A, which addressed the presumption of innocence and proof beyond a reasonable doubt, was given over Defendant's objection. The uncontested part of the instruction is from HAWJIC 3.02 and stated:

You must presume the defendant is innocent of the charges against him. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.

The presumption of innocence is not a mere slogan but an essential part of the law that is binding upon you. It places upon the prosecution the duty of proving every material element of the offenses charged against the defendant beyond a reasonable doubt.

You must not find the defendant guilty upon mere suspicion or upon evidence which only shows that the defendant is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but proof of the defendant's guilt beyond a reasonable doubt.

What is reasonable doubt?

It is a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon reason and common sense.

Each of you must decide, individually, whether there is or is not such a doubt in your mind after careful and impartial consideration of the evidence.

Be mindful, however, that a doubt which has no basis in the evidence presented, or the lack or evidence, or reasonable inferences therefrom, or a doubt which is based upon imagination, suspicion or mere speculation or guesswork is not a reasonable doubt.

What is proof beyond a reasonable doubt?

At this point, HAWJIC 3.02 reads as follows:

If, after consideration of the evidence and the law, you have a reasonable doubt of the defendant's guilt, then the prosecution has not proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant not guilty.

If, after consideration of the evidence and the law, you do not have a reasonable doubt of the defendant's guilt, then the prosecution has proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant guilty.

However, the court refused the balance of HAWJIC 3.02 and in its place gave the following last paragraph, taken from instruction 21 [16] of the Federal Judicial Center's Pattern Criminal Jury Instructions 17–18 (1987): [17]

Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of

**16.** Instruction 21 of the Federal Judicial Center's Pattern Criminal Jury Instructions 17–18 (1987) (the FJC instruction), in its entirety, states:

As I have said many times, the government had the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is only necessary to prove that a fact is more likely than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must

give him the benefit of the doubt and find him not guilty.

**17.** The FJC instruction was endorsed by Justice Ginsberg of the United States Supreme Court. *Victor v. Nebraska,* 511 U.S. 1, 26, 114 S.Ct. 1239, 127 L.Ed.2d 583, *reh'g denied, sub nom. Sandoval v. California,* 511 U.S. 1101, 114 S.Ct. 1872, 128 L.Ed.2d 492 (1994), (Ginsberg, J., concurring). The FJC instruction's reception, however, has apparently been a mixed one.

The fourth and seventh circuits have discouraged their district courts from employing *any* definition of reasonable doubt when instructing the jury. *See United States v. Porter,* 821 F.2d 968, 972 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988) (stating that "[it] has urged trial courts to avoid defining reasonable doubt unless requested to do so by the jury, because of the risk that the definition will create confusion and impermissibly lessen the required burden of proof"). *See also United States v. Shaffner,* 524 F.2d 1021, 1023

**126**

the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based upon your consideration of the evidence, you are *firmly convinced* that the defendant is guilty of the crimes charged, you must find him guilty. If on the other hand, you think there is a *real possibility* that he is not guilty, *you must give him the benefit of the doubt* and find him not guilty.

(Emphases added.) On appeal, Defendant objects to the foregoing emphasized language in the last paragraph of Instruction 2A.

### A.

Defendant makes three specific challenges to the last paragraph: (1) the use of the phrase "real possibility" suggests to the jury that it should consider material beyond the scope of evidence; (2) the phrase "you must give him the benefit of the doubt" de-emphasizes the State's burden of proof and shifts the burden onto Defendant; and (3) the requirement that the jury be "firmly convinced" of Defendant's guilt diminishes the standard of proof required to convict a defendant.

■ In evaluating Defendant's challenges, we must decide whether " 'the instructions correctly conveyed the concept of reasonable doubt to the jury.' " *State v. Olivera,* 57 Haw. 339, 342, 555 P.2d 1199, 1201 (1976) (quoting *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), *reh'g denied,* 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1955)).[18] Also, while we may examine each of Defendant's claims separately, we

(7th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976) (opining that "any use of an instruction defining reasonable doubt presents a situation equivalent to playing with fire"); *United States v. Lawson,* 507 F.2d 433, 442 (7th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975) (reasoning that "[b]ecause of the very commonness of the words [beyond a reasonable doubt], the straining for making the clear more clear has the trap of producing complexity and consequent confusion").

In the first, second, and fourth circuits, the FJC instruction has been criticized as being potentially confusing to jurors. *See, e.g., United States v. Gibson,* 726 F.2d 869, 874 (1st Cir. 1984), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984) (reasoning that a portion of the FJC instruction "might possibly engender some confusion as to the burden of proof," although adopting an instruction similar to the version adopted by the circuit court in this case, but including the language "[i]f the two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, the jury should adopt the one of innocence" at the end of the instruction); *United States v. Reese,* 33 F.3d 166, 172 (2d Cir.1994), *cert. denied,* 513 U.S. 1092, 115 S.Ct. 756, 130 L.Ed.2d 655 (1995) (stating that "the trial judge used the potentially confusing 'real possibility' language" of the FJC instruction); *United States v. McBride,* 786 F.2d 45 (2d Cir.1986) (see discussion *infra* in text); *Porter,* 821 F.2d 968 (see discussion *infra* in text).

Some federal courts have adopted a modified version of the instruction. *See United States v. Artero,* 121 F.3d 1256, 1258 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1089, —— L.Ed.2d —— (1998) (adopting a version of the FJC instruction which included the additional

sentence, "You may not convict on the basis of mere suspicion.").

Other federal courts have urged use of an entirely different pattern instruction. *See, e.g., United States v. Williams,* 20 F.3d 125, 129 n. 2 (5th Cir.), *cert. denied,* 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994) (holding it was not error for the trial court to have employed a modified version of the FJC instruction, but urging that trial courts use the Fifth Circuit's Pattern Jury Instruction instead); *United States v. Hunt,* 794 F.2d 1095, 1100 (5th Cir.1986) (finding no error in the district court's use of a modified version of the FJC instruction, but instead encouraging the lower courts to use the Fifth Circuit's Pattern Jury Instruction); *McBride,* 786 F.2d at 52 (stating that the use of a modified form of the FJC instruction did not constitute "reversible error," but urging that trial courts, instead, employ a completely different Federal Judicial Center instruction that described reasonable doubt in terms of a "hesitat[ion] to act").

18. In *Victor,* 511 U.S. at 5, 114 S.Ct. 1239, the United States Supreme Court observed that "[t]he beyond a reasonable doubt standard is a requirement of due process" under the Fifth and Fourteenth Amendments to the United States Constitution.

It is plain that the protections afforded our citizens by the due process clause in article I, section 5 of the Hawai'i State Constitution would include the requirement that a criminal conviction must be supported by proof beyond a reasonable doubt. Thus, article I, section 5 of our constitution constitutes a separate source of that requirement, independent of the United States

must consider the instruction as a whole to determine whether it correctly conveyed the meaning of beyond a reasonable doubt to the jury. *State v. Iosefa,* 77 Hawai'i 177, 183, 880 P.2d 1224, 1230 (App.), *cert. dismissed,* 77 Hawai'i 373, 884 P.2d 1149 (1994) (internal quotation marks and citations omitted). *See also Holland,* 348 U.S. at 140, 75 S.Ct. 127; *Olivera,* 57 Haw. at 342, 555 P.2d at 1201.

### B.

■ We first address Defendant's dispute with the direction to the jurors that if they "think" there is a "real possibility that [a defendant] is not guilty, [they] must give him [or her] the benefit of the doubt." At least two federal courts have cautioned against the use of the words "real possibility."

In *United States v. Porter,* 821 F.2d 968 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988), the Court of Appeals for the Fourth Circuit indicated that the phrase "real possibility that [the defendant] is not guilty" would clash with the instruction on presumption of innocence:

> The district court's instruction in this case illustrates the confusion that is engendered by attempting to define a reasonable doubt in terms of a "real possibility" that the accused is not guilty. The district court did not explain the difference that it perceived between a "possibility" and a "real possibility." *It failed to tell the jury that the accused did not have the burden of showing a "real possibility" of innocence. Implying the evidence must show a real possibility of innocence to justify acquittal trenches on the principle that a defendant is presumed to be innocent.* If the court believed that the jury could understand its concept of "real possibility" and allocate the burden of proof on this issue, there was no reason for it to question the jury's ability to understand the prosecution's obligation to prove the charges beyond a reasonable doubt.

*Id.* at 973 (emphasis added).

In addition, the United States Court of Appeals for the Second Circuit "suggest[ed] caution in the use of [real possibility]" as it is used in the Federal Judicial Center's "proposed instruction relating to the reasonable doubt standard[.]" *United States v. McBride,* 786 F.2d 45, 52 (2d Cir.1986). The court of appeals stated that "such language . . . may provide a basis for confusion and may be misinterpreted by jurors as unwarrantedly shifting the burden of proof to the defense." *Id.* Both courts, accordingly, appear to suggest that the words "real possibility" impliedly shift the burden of proof from the prosecution to the defense.

The Fifth Circuit Court of Appeals, conversely, found "no infirmity" in the use of the "real possibility" language. It indicated that the words "real possibility" merely emphasized the fact that not every conceivable doubt was a reasonable doubt. *United States v. Williams,* 20 F.3d 125, 131 (5th Cir.), *cert. denied,* 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994) (citing *Victor v. Nebraska,* 511 U.S. 1, 13, 114 S.Ct. 1239, 127 L.Ed.2d 583, *reh'g denied, sub nom. Sandoval v. California,* 511 U.S. 1101, 114 S.Ct. 1872, 128 L.Ed.2d 492 (1994)). *See also United States v. Hunt,* 794 F.2d 1095, 1101 (5th Cir.1986) (rejecting defendant's argument that "the [trial] court's words . . . requir[ed] . . . defendants to prove a real possibility of their innocence before the jury may properly extend to them the benefit of the doubt" because "nowhere [in the instructions] did the court impose the duty on the defendants to show their innocence").

The use of the words "real possibility," in our view, conflicts with the admonition to the jury that the nature of the doubt with which the jurors must be concerned is one which is "reasonable." Moreover, advising the jury its verdict of "not guilty" rests on whether it "think[s]" there is a "real possibility" the defendant is not guilty invites the jury to abandon the presumption of innocence. The jury here was apprised of its obligation to presume Defendant innocent until the prosecution had proven each element of the crime beyond a reasonable doubt. By tying a verdict of not guilty to the concept of "real possibility," however, Instruction 2A raises an unnecessary inconsistency with the court's

Constitution. Our discussion herein rests on section 5.

direction that the jury must presume the defendant innocent.

■ We also see no purpose for instructing the jury that it must give a defendant the benefit of the doubt. A defendant may not be convicted " 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *Iosefa*, 77 Hawai'i at 183, 880 P.2d at 1230 (quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Therefore, a criminal defendant is unequivocally entitled to an acquittal if the State fails to prove any element of the crime beyond a reasonable doubt, and an instruction should not imply otherwise.

## C.

■ We believe Defendant's last claim to be the most compelling. We conclude the court's instruction to the jury that it must be "firmly convinced" of Defendant's guilt in order to convict constitutes reversible error.

Few federal appellate courts have been confronted with a direct challenge to the trial court's use of the "firmly convinced" language. In *Porter*, the Court of Appeals for the Fourth Circuit held that the district court committed error by including the "unnecessary" concept of "firmly convinced" of guilt in its jury instruction. *Porter*, 821 F.2d at 973. In finding, however, that the instruction, "taken as a whole properly described the prosecution's burden and the protection the laws affords the accused," the court of appeals "disregarded" this error because it did not "affect the substantial rights of the accused." *Id.*

In *United States v. Bustillo*, 789 F.2d 1364, 1368 (9th Cir.1986), the defendant "argue[d] that th[e] [firmly convinced] instruction was defective in that it reduced the Government's burden of proof." *Id.* Dismissing the defendant's argument, the appeals court stated that "[the defendant] point[ed] to no authority which suggests that the 'firmly convinced' language used by the court constituted plain error." *Id.*

In *Williams*, the appellants argued that the trial court's use of the "firmly convinced" language "understated the government's burden of proof by describing it closer to the preponderance of the evidence standard than the constitutionally required beyond a reasonable doubt standard." *Williams*, 20 F.3d at 131. The court of appeals was "not persuaded" by this argument. *Id.* It asserted that "[t]he appellants cannot complain that the 'firmly convinced' formulation speaks in term of probabilities because the 'beyond a reasonable doubt standard is itself probabilistic.' " *Id.* (quoting *Victor*, 511 U.S. at 14, 114 S.Ct. 1239).

■ However, in our view, it is possible to be firmly convinced of a fact, yet still retain a reasonable doubt. In Instruction 2A, the reasonable doubt standard is ultimately reduced to one akin to the standard applied where the burden of proof required is that of clear and convincing evidence. The Hawai'i Supreme Court has described clear and convincing evidence as

> *an intermediate standard of proof* greater than a preponderance of the evidence, but *less than proof beyond a reasonable doubt required in criminal cases.* It is that degree of proof which will produce in the mind of the trier of fact *a firm belief of conviction* as to the allegation sought to be established, and requires the existence of a fact be highly probable.

*Masaki v. General Motors Corp.*, 71 Haw. 1, 15, 780 P.2d 566, 574, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989) (citations omitted) (emphases added).

Similarly, Hawai'i Standard Civil Jury Instruction 3.5 (1994) provides that

> [t]o prove by clear and convincing evidence means to prove by evidence which, in your opinion, *produces a firm belief* about the truth of the allegations which the parties have presented. It means to prove that the existence of a fact is highly probable.
>
> Clear and convincing evidence is a higher requirement of proof than the preponderance of the evidence requirement, but *it is a lower requirement of proof than the beyond a reasonable doubt requirement* in criminal cases.

(Internal quotation marks omitted) (emphases added).

We believe the term "firmly convinced" is so like the term "firm belief of conviction" that is associated in the law with the lesser burden of clear and convincing evidence, as to communicate something less than the highest burden under the law, that of *"beyond* a reasonable doubt." In communicating a lesser quantum of proof as satisfying the prosecution's burden of proof, Instruction 2A failed to "correctly convey[ ] the concept of reasonable doubt to the jury." *Olivera,* 57 Haw. at 342, 555 P.2d at 1201 (internal quotation marks and citation omitted). Since the last paragraph of Instruction 2A defined the proof required to satisfy the prosecution's burden, it is not susceptible to qualification by the preceding paragraphs. Moreover, because of its definitional and conclusory function, we are not persuaded that its infirmity is cured by reference to the other instructions as a whole.

■■■ We have said that a defendant's right to the establishment of proof beyond a reasonable doubt in a criminal case is guaranteed under the due process clause of the Hawai'i State Constitution. *See supra* note 18. Because Instruction 2A failed to correctly convey the reasonable doubt standard to the jury, it violated that right. The violation of a defendant's rights under the Hawai'i Constitution is reviewed under the "harmless beyond a reasonable doubt rule." *State v. Silva,* 78 Hawai'i 115, 125, 890 P.2d 702, 712 (App.1995). The "firmly convinced" language of the instruction diminished the very high standard by which the jury must abide in order to convict. Consequently, we cannot say beyond a reasonable doubt that this error did not contribute to the convictions. *Id.* at 125–26, 890 P.2d at 712–13.

■■■ In our view, HAWJIC 3.02 avoids the problems generated by Instruction 2A. HAWJIC 3.02 adequately defines reasonable doubt to a juror as "a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon reason and common sense." With this in mind, the jurors are then appropriately directed that with respect to proof beyond a reasonable

doubt, they are to consider the evidence and the law and from that consideration, to render the verdict appropriate to the reasonable doubt which does or does not arise in their minds. *See id.*

## V.

### A.

Finally, Defendant claims that the following remarks in the State's rebuttal argument were an impermissible comment on punishment:

> So bear in mind that when [defense counsel] keeps talking about this is all based on the evidence[, w]hat it's based on is his word[.] ... [A]nd the State submits to you, you're adult beings [sic] with common sense and intelligence. You know full well that it's very easy to say anything, you know. It's very easy to say the dog ate my homework if you are in trouble. It's easy to say anything.
>
> And consider his situation, too. Consider his situation. *He knows what kind of serious trouble he is in and the kind of potential serious trouble he's looking at. He has a motive to lie to you in this case.* It doesn't take a whole lot of common sense to see that.

(Emphasis added). Defendant did not object to the State's comments during or after the State's argument.

### B.

■■■ Defendant asserts that (1) by referring to "potential serious trouble," the State invited the jury to look beyond the evidence presented and to consider the issue of punishment; (2) there was no way for the State to conclude, based on the evidence presented, that Defendant "knew" about the "serious trouble" he was facing; and (3) the jurors were advised by the State to judge his credibility more harshly based on the nature of the charge against him.

As to the first contention, however, we note that in Instruction 26,[19] the court admonished the jury "not [to] discuss or consider the subject of penalty or punishment in

---

**19.** We refer to the court's proposed instruction   no. 26 as Instruction 26.

[its] deliberations[.]" We may presume that "the jury adhered to the court's instructions[.]" *State v. Samuel,* 74 Haw. 141, 149 n. 2, 838 P.2d 1374, 1378 n. 2 (1992) (citing *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978)).

With respect to the second argument, we conclude the State did not need to prove Defendant's knowledge of any potentially negative outcomes in order to point out that he had an interest in the ultimate result of the case. It could be readily inferred that Defendant would be aware of the seriousness of his situation.

■ Lastly, the Hawai'i Supreme Court has rejected argument similar to that made here on the basis that one who testifies may have his or her credibility challenged in the same manner as any other witness. *See State v. Apilando,* 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995). *See also State v. Pokini,* 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976). In *Apilando,* the defendant had testified on his own behalf. During closing argument, the prosecutor commented that the defendant "had the highest stake in the outcome of the case, he had the greatest motive to lie." *Apilando,* 79 Hawai'i at 142, 900 P.2d at 149. The supreme court held that these statements were not improper under Hawai'i Rules of Evidence (HRE) Rule 609.1. *Id.* Here, Defendant testified on his own behalf, thereby subjecting himself to attacks on his credibility for "bias, interest, or motive." HRE Rule 609.1.[20]

### VI.

Because we conclude the court erred in giving Instruction 3 and in giving a modified version of HAWJIC 3.02 in Instruction 2A, we vacate the judgment and sentence herein and remand the case for a new trial.

---

**20.** Hawai'i Rules of Evidence Rule 609.1 (1985) provides that "[t]he credibility of a witness may be attacked by evidence of bias, interest, or motive."