909 P.2d 1133

STATE of Hawai'i, Plaintiff–Appellee,

v.

John E. KNIGHT, Defendant–Appellant.

No. 18017.

Supreme Court of Hawai'i.

Jan. 12, 1996.

David C. Schutter and Emlyn H. Higa of David C. Schutter & Associates, on the briefs, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial, defendant/appellant John E. Knight appeals his conviction of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) §§ 707–

701.5 (1993)[1] and 706–656(2) (1993).[2] On appeal, Knight contends that: (1) the trial court committed reversible error when it refused to give the jury an instruction on reckless manslaughter; and (2) he was denied a fair trial due to prosecutorial misconduct. For the reasons discussed below, we affirm Knight's conviction.

## I. *BACKGROUND*

On August 20, 1991, Knight was indicted for the second degree murder of William A. Rowe, a homosexual male. At trial, Knight maintained that his experimental homosexual encounter with Rowe caused him to "whig[ ] out big time" and that, the next thing he knew, he had slit Rowe's throat. The prosecution, on the other hand, essentially maintained that Rowe's death was the result of an attempted robbery, targeted at homosexuals, that had gone awry.

The testimony at trial revealed that in the late evening hours on August 10, 1991, Knight, a United States Marine, departed his barracks at the Kaneʻohe Marine Corps Air Station bound for Waikiki. Soon after Knight arrived in Waikiki and parked his vehicle, Knight met Rowe for the first time. The two men decided to travel together—in Rowe's vehicle—to a Honolulu nightclub. On their way to the nightclub, they stopped at Rowe's apartment in Waikiki in order to allow Rowe to pick up some more money. At Rowe's request, Knight accompanied Rowe inside the apartment.

According to Knight, when they entered the apartment, Rowe offered him a beer, which he accepted. "[B]y this time," Knight testified, "I was starting to get the idea that [Rowe] was a homosexual...." Knight stated that his suspicion was soon thereafter "basically confirmed," and, upon learning of Rowe's homosexuality, Knight testified that he "start[ed] getting a little nervous." However, instead of leaving, Knight began to discuss homosexuality with Rowe. At trial, Knight testified that he was considering whether to experiment with homosexual conduct with Rowe:

Q. [By defense counsel] Did he proceed to make anymore remarks to you that suggested homosexual activity?

A. [By Knight] Yes.

Q. What did he say?

A. Asked me if I'd ever been with a man?

Q. What did you tell him?

A. No.

Q. Okay. Did you say anything else?

A. Yes.

Q. What did he tell you?

A. Told me it was quite a bit different, but just as gratifying than it is with a woman, and that he asked me if I'd like to try. I told him I wasn't sure.

Q. And how were you feeling at that time?

A. Strange.

Q. Did you want to, did you not want to?

A. Both yeah.

Rowe then prepared Knight an omelette, which Knight ate while the two men engaged in "small talk."

According to Knight, when he finished the omelette, Rowe, who was "being cool" and not "forcing" Knight, "touched [Knight's] shoulder [and] asked [Knight] if [he] was feeling better relax [sic] type of thing"; Knight "told him yeah."

Knight testified that he then accepted Rowe's invitation to join Rowe in the bedroom. Upon entering the bedroom, Rowe "sat down in [sic] his bed facing [Knight], told [Knight] to relax again, and he started fondling [Knight]." At that point, Knight removed his own shirt and allowed Rowe to pull his (Knight's) pants down, at which time Rowe again fondled Knight's genitals.

1. HRS § 707–701.5 provides:
    (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
    (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

2. HRS § 706–656(2) provides in pertinent part that "[p]ersons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole."

Knight further testified that he "just felt sick[,] ... backed away from [Rowe], picked up [his] shirt[,] pulled up [his] pants[,] and walked out of the room." A few minutes later, Knight informed Rowe that he was leaving.

Knight then began to gather his belongings, which included his wallet, keys, handcuffs, and a twelve inch military-style knife with a six-and-a-half inch single-edged blade that Knight described as "a very impressive knife." When Rowe heard the handcuffs clink together, he asked to see them. Rowe fastened one handcuff around his own left wrist, and Knight secured the other handcuff to Rowe's right wrist. While handcuffed, Rowe knelt before Knight and again fondled Knight's genitals.

Q. [By defense counsel] What did you do?

A. [By Knight] I whigged out big time.

Q. How did you feel when he was doing that?

A. Sick. Just wanted him to stop. I just wanted him you know I wanted him to stop.

Q. Did you tell him to stop?

A. Nope.

Q. What did you do?

A. *I freaked out. I blanked, and next thing I knew it was seen [sic] my hand come away from his neck with the knife.*

(Emphasis added.)

On cross-examination, Knight further testified as follows:

Q. [By the prosecution] [W]hat happened next?

A. [By Knight] I had the knife in my right hand, my left hand was free. I pushed him away from me.

Q. Well, when did you slice his throat?

A. Just before that.

Q. So you were in front of him when you did that?

A. When I sliced his throat?

Q. Yes.

A. No.

Q. Off to the side ...?

A. Yes, he was ... on his knees facing me.

Q. And you were using the knife in your right hand?

A. Yes.

Q. And you sliced his throat from the beginning part back; correct?

A. Yes.

Q. [W]hen you sliced his throat, where was his hands?

A. They were in front of him.

Q. Doing what?

A. *At that point, nothing was crystal clear[,] nothing was even clear.*

Q. How many seconds was it not crystal clear for you?

A. I don't know.

Q. Approximately?

A. Five.

Q. Five seconds?

A. Yes.

(Emphasis added.)

The prosecution called, as witnesses, three of Knight's friends and fellow Marines to prove that Knight had: (1) schemed to rob homosexuals; (2) selected Rowe as his first victim; and (3) intentionally slit Rowe's throat.

First, Jason DeCesare testified that, on July 31, 1991, approximately eleven days before Rowe's murder, he and Knight went to see a violent movie. DeCesare stated that, on the way home from the movie, Knight "started talking about a way to make more money."

Q. [By the prosecution] How was he going to make more money?

A. [By DeCesare] He wanted to find a faggot, I guess and get to know him better and tie him up and rob him.... [O]ne person would help hold him at knife point.

Q. Where would that person hold him at knife point?

....

A. Throat....

....

Q. [A]fter holding a knife to somebody's throat, what would happen next?

A. One person would get his bank card and go to the machine while the other person held him and then come back.

Q. What would happen when he c[a]me back?

A. Just he wanted to beat him up severely and just leave him there and take off.

Second, Chris Little testified that Knight had told him, within hours after Rowe's murder, that "he [Knight] had got . . . a faggot." Little testified:

Then he proceeded to try to prove to me. He kept telling me that he met the guy in a street in Waikiki, then they went to his place, and he said he told me he planned to rob him, and he said he was in the apartment, came out of the bathroom and that's when he he the guy [sic] on the ground he said he asked for his wallet or something I guess that's what he said I'm not too sure about that.

He asked for the wallet or bank card or something, and then I asked him, I said well why did you kill him, he said it just happened so fast he didn't even realize. He said he had it there it was accident just boom next thing he knows the guy was dead.

. . . .

He said the guy was laying on his belly on the ground and he had the knife on there when he was asking him for the bank ca[rd] or wallet he said after he got it, that's when he said he just blanked out it just happened.

Third, Mark Thomas Hulsey testified that, on August 14, 1991, a few days after Rowe's murder, Knight approached Hulsey with a scheme to make money. Hulsey stated that:

[Knight] said he went down to Waikiki, and saw this guy coming out of a bar and he thought he was gay [be]cause he was coming out of this gay bar he knew was gay, and he said he approached the gentleman, and picked him sort of picked him up asked him what time it was and sort of picked him up.

He then took the gentleman back to the person[']s apartment, and the guy asked [Knight] if he was hungry, and he said yeah, so he made [Knight] some eggs or an omelette, and they were drinking some beer, and he said the guy went over and sat down in the chair, and he came up behind him and pulled a knife out and held a knife to his throat and told him to stick his hands out in front of him, and the guy stuck his hands out in front of him hand cuffed him through the cuffs real hard on the wrists.

Threw him on the floor face down, put the knife to his throat and took the wallet out and took went through the wallet took out some kind of ATM or bank card and asked the guy what's the number to this card.

The guy didn't, he didn't want to tell him [sic] tell me or I'm going to cut your throat and the guy went ahead and told him, and he said if this is the number if this isn't the number I'm going to be back here in an hour to let you go. He said he put his knee in the guy's back and pulled his hair and just cut his throat.

Finally, Knight's own testimony indicates that he intentionally slit Rowe's throat. On the night of the murder, Knight had armed himself with handcuffs and what he termed "a very impressive knife." Knight then proceeded to Waikiki, where he "picked up" Rowe and accompanied him to Rowe's apartment. Knight testified that, at the moment he slashed Rowe's throat with his "very impressive knife," Rowe was kneeling before Knight, and his wrists were bound by Knight's handcuffs.

At trial, Knight essentially argued that, because he was sexually and emotionally abused as a child by his father, he became homophobic; therefore, his encounter with homosexuality caused him extreme mental or emotional disturbance, which, in turn, caused him to kill Rowe. Consequently, Knight maintained that his crime should be reduced from murder in the second degree to manslaughter by virtue of an extreme mental or emotional disturbance for which there was a reasonable explanation (EMED manslaughter).[3] The only evidence proffered by Knight

---

3. HRS § 707–702(2) (1993) reads in pertinent part:

with respect to his claim of child sexual abuse was his own testimony that his father had sexually abused him at the ages of five, six, and eleven. With respect to his claim of emotional abuse, Knight testified that, because his father objected to Knight's relationship with his mother, his father had called him a mama's boy, a sissy, and a wimp. Knight's mother corroborated Knight's testimony that he was emotionally abused by his father.

At the close of the evidence, the trial court instructed the jury on the law regarding second degree murder and EMED manslaughter. The trial court refused, however, to instruct the jury "on the included offense of reckless manslaughter," as provided for in HRS § 707–702(1)(a) (1993).[4] On January 11, 1994, the jury adjudged Knight guilty of murder in the second degree. On March 2, 1994, Knight was sentenced to life imprisonment, and this appeal followed.

## II. *JURISDICTION*

■ Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b) (1995) provides that, "[i]n a criminal case, whether the appeal is one of right or is an interlocutory appeal, the notice of appeal by a defendant shall be filed in the circuit or district court within 30 days after the entry of judgment or order appealed from[,]" unless: (1) the trial court extends the time for filing up to thirty days, or (2) the time for filing the notice of appeal has been tolled by a motion in arrest of judgment or a motion for new trial. Also, HRS § 641–11 (1993) provides that "[t]he sentence of the court in a criminal case shall be the judgment."

As previously stated, Knight was sentenced and his judgment of conviction entered on March 2, 1994; thus, his notice of appeal was due on April 1, 1994. Knight, however, filed his notice of appeal on April 25, 1994, fifty-four days after the trial court entered judgment. Knight neither sought an extension of time to appeal nor filed a tolling motion.

■ "As a general rule, compliance with the requirement of timely filing of a notice of appeal is jurisdictional, and we must dismiss an appeal on our motion if we lack jurisdiction." *Grattafiori v. State,* 79 Hawai'i 10, 13, 897 P.2d 937, 940 (1995) (quotation marks and citations omitted). However, "we have permitted belated appeals under [certain] circumstances, namely, when ... defense counsel has inexcusably or ineffectively failed to pursue a defendant's appeal from a criminal conviction in the first instance[.]" *Id.* at 13–14, 897 P.2d at 940–41 (citation omitted); *see also State v. Ahlo,* 79 Hawai'i at 385–392, 903 P.2d 690, 697 (Ct.App.1995) ("This court and the Hawai'i Supreme Court have seen fit in criminal cases to relax the deadline for filing a notice of appeal 'where justice so warrants.'" (Citations omitted.)).

In this case, the affidavit of Knight's counsel, attached to the statement of jurisdiction, filed pursuant to HRAP 12.1, indicates that he prepared and signed a notice of appeal document prior to April 1, 1994. Assuming the document had been filed, counsel left on a business trip to the mainland. Upon his return, he discovered that his secretary did not file the notice of appeal, apparently because she did not realize the urgency of filing the appeal document by the April 1 deadline. However, not wishing to place the "blame" upon his secretary, Knight's counsel acknowledged that it was his responsibility to see that the notice of appeal was timely filed and offers no other explanation for its late filing.

■ Notwithstanding counsel's failure to comply with the time requirements of HRAP Rule 4(b), Knight, as a criminal defendant, is entitled, on his first appeal, to effective counsel who may not deprive him of his appeal by

---

In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he [or she] believed them to be.

4. HRS § 707–702(1)(a) provides in pertinent part that "[a] person commits the offense of manslaughter if ... [h]e [or she] recklessly causes the death of another person[.]"

failure to comply with procedural rules. *State v. Erwin,* 57 Haw. 268, 270, 554 P.2d 236, 238 (1976). In the interest of justice, we decline to dismiss this appeal and will address the merits of Knight's alleged points of error.

## III. *DISCUSSION*

### A. *Knight's Requested Reckless Manslaughter Instruction*

■■■ As previously stated, the trial court refused to instruct the jury on the included offense of reckless manslaughter. "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (citations omitted and emphasis in original deleted).

■■■ Reckless manslaughter is an included offense of second degree murder. *State v. Holbron,* 80 Hawai'i 27, 42, 904 P.2d 912, 927 (1995) (quoting *State v. Pinero,* 70 Haw. 509, 523–24, 778 P.2d 704, 713–14 (1989)). However, under HRS § 701–109(5) (1993), "[t]he court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him [or her] of the included offense." *See State v. Kupau,* 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994) (holding that, if there is a "rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him [or her] of the included offense," the trial court must present the included offense instruction to the jury "unless (1) the prosecution does not request that included offense instructions be given and (2) the defendant specifically objects to the included offense instructions for tactical reasons" (footnote omitted)). Because Knight requested a jury instruction on the lesser included offense, the threshold inquiry on appeal is whether the jury, based on the evidence in this case, *rationally* could have acquitted Knight of second degree murder and convicted him instead of reckless manslaughter.

Knight contends that an instruction on reckless manslaughter should have been presented to the jury because, although "the primary defense in [his] case was extreme mental or emotional disturbance,"

> [t]here was evidence adduced from which the jury could conclude that [Knight] was, because of his history of physical, emotional and sexual abuse by his father, sensitive to sexual contact with men. And once he was with Rowe in Rowe's apartment, and realized that Rowe was trying to seduce him, [Knight] should have recognized that the strong, conflicting emotions that were rising up within him might lead to violence. *By staying with Rowe in his apartment, and not leaving earlier, [Knight] consciously disregarded a[ ] substantial and unjustifiable risk that he was allowing Rowe to engage in conduct that angered [him] to the point of violence.*

(Emphasis added.) This contention is without merit. The evidence adduced at trial does not support a reckless manslaughter instruction; rather, the evidence supports an EMED instruction, which Knight received.

As previously noted, under HRS § 707–702(1)(a), "[a] person commits the offense of manslaughter if ... [h]e [or she] recklessly causes the death of another person[.]" "Recklessly" is defined as follows:

> (a) A person acts recklessly with respect to his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.
>
> (b) A person acts recklessly with respect to attendant circumstances when he [or she] consciously disregards a substantial and unjustifiable risk that such circumstances exist.
>
> (c) A person acts recklessly with respect to a result of his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that his [or her] conduct will cause such a result.
>
> (d) A risk is substantial and unjustifiable ... if, considering the nature and purpose of the person's conduct and the circumstances known to him [or her],

the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

HRS § 702–206(3) (1993).

In determining whether, on the record before us, there was a rational basis for a verdict acquitting Knight of second degree murder and convicting him of reckless manslaughter, we first outline pertinent general principles of criminal culpability.

"HRS § [§] 701–114(1)(a) and (b) [ (1993) ] require[ ] proof beyond a reasonable doubt of each element of the offense, as well as 'the state of mind *required* to establish each element of the offense.' " *State v. Pinero,* 75 Haw. 282, 300, 859 P.2d 1369, 1378 (1993).... Moreover, HRS § 702–204 [ (1993) ] provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense."

*Holbron,* 80 Hawai'i at 39, 904 P.2d at 924 (citations omitted and emphasis in original). "When the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." HRS § 702–207 (1993). "The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as [a]re specified by the definition of the offense[.]" HRS § 702–205 (1985).

█ In the instant case, the elements of reckless manslaughter, each of which the prosecution would have been required to prove beyond a reasonable doubt, are that: (1) Knight caused the death of a person—in this case, Rowe; and (2) Knight did so recklessly as defined in HRS § 702–206(3).

The defendant in *People v. Mocaby,* 194 Ill.App.3d 441, 141 Ill.Dec. 486, 551 N.E.2d 673 (1990), was convicted by a jury of the murder of his son. At trial, the defendant relied on a version of the "whigged out" defense.

The victim[, defendant's son,] was arguing with family members and it was becoming quite loud. The victim shoved Anita[, defendant's daughter,] and defendant thought Anita "was in trouble, so I thought I've got to break it up or help Anita, go to [Anita's] assistance." Defendant[, who had been drinking heavily,] remembered getting up from where he was sitting to help Anita. The next thing defendant remembered was the victim holding himself and defendant holding the knife....

Defendant admitted that he had no reason or desire to kill the victim that day and that he did not remember intending to hurt or kill the victim.

*Id.,* 141 Ill.Dec. at 489, 551 N.E.2d at 676. On appeal, the defendant argued, *inter alia,* that the trial court erred in refusing to instruct the jury on the offense of involuntary (that is, reckless) manslaughter. *Id.,* 141 Ill.Dec. at 492, 551 N.E.2d at 679. The appellate court initially noted that "[t]he crime of involuntary manslaughter occurs where death results from acts performed recklessly, but without the intent to injure." *Id.* (citing *People v. Platter,* 89 Ill.App.3d 803, 45 Ill.Dec. 48, 61, 412 N.E.2d 181, 194 (1980)); *see also Holbron,* 80 Hawai'i at 35, 904 P.2d at 917 ("[I]t is the essence of involuntary manslaughter that the consequence be produced recklessly." (Internal quotation marks and ellipsis points omitted.)). The court further stated that, "[w]here the evidence demonstrates that the defendant acted with the intent to kill or injure the victim, an involuntary manslaughter instruction is not warranted." *Mocaby,* 141 Ill.Dec. at 489, 551 N.E.2d at 676.

In concluding that the evidence did not warrant an involuntary manslaughter instruction, the court stated that

all the evidence indicates that defendant acted intentionally in stabbing the victim. There is no evidence that the stabbing occurred during the course of a struggle between the defendant and the victim or that the stabbing occurred accidentally when defendant recklessly approached the victim brandishing a weapon....

*There must be some evidence in the record that the defendant did not intend to*

*injure or kill the victim when he stabbed him, but that the stabbing occurred only through the defendant's recklessness in approaching the victim while holding a knife.*

*Id.* (emphasis added).

As previously stated, Knight argued at trial that he was homophobic due to alleged sexual abuse by his father and that, knowing he was homophobic, "[b]y staying with Rowe in [Rowe's] apartment, and not leaving earlier, [Knight] consciously disregarded a[ ] substantial and unjustifiable risk that he was allowing Rowe to engage in conduct that angered [him] to the point of violence." Consequently, Knight submits that the trial court was required to instruct the jury on the offense of reckless manslaughter. We disagree.

Although Knight's own testimony suggests otherwise, even if we were to assume, *arguendo,* that Knight was aware of his homophobia prior to the moment he "whigged out" and killed Rowe, Knight's decision to remain in the apartment, notwithstanding his homophobia, was not the "cause" of Rowe's death. Rather, the "cause" of Rowe's death was the knife wound to Rowe's throat, which Knight admits inflicting. Knight's "whigged out" theory does not suggest that the slashing of Rowe's throat (the cause of death) occurred through Knight's recklessness in approaching the victim while holding a knife, *see Mocaby, supra,* or that he consciously disregarded a substantial and unjustifiable risk that slashing Rowe's throat would cause Rowe's death. In effect, Knight does not argue that his actions were unintentional, but rather that they were uncontrollable. Such a defense is encompassed under EMED manslaughter, that is, the intentional killing of another "while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control." *Holbron,* 80 Hawaiʻi at 42, 904 P.2d at 927. As previously indicated, the jury received an EMED instruction; thus, the jury, in finding Knight guilty of second degree murder, necessarily determined either that Knight experienced no loss of control, or, if he did, that it was not, in fact, reasonable.

Furthermore, apart from Knight's "whigged out" theory, which, as shown above, is irrelevant to a consideration of reckless manslaughter, there was no rational basis in the record for acquitting Knight of intentional murder and convicting him of the lesser included offense of reckless manslaughter because there was no evidence from which a jury rationally could have concluded that Knight's slashing of Rowe's throat was reckless. All of the evidence adduced at trial indicated that Knight intentionally slashed Rowe's throat.

We therefore hold that the trial court did not err in refusing Knight's requested instruction regarding reckless manslaughter.

### B. *Knight's Allegations of Prosecutorial Misconduct*

Knight contends on appeal that he was denied a fair trial because of prosecutorial misconduct. During cross-examination of Knight, the prosecutor engaged in the following line of inquiry:

Q. [By the Prosecutor] Brian Knight, your brother, he's two years younger than you; correct?

A. [By Knight] Yes.

Q. He's the closest in age to you; correct?

A. Yes.

Q. Would it surprise you to know that Brian said you were never sexually abused?

[Defense counsel]: Objection, this is not in evidence.

A. No, it wouldn't.

THE COURT: Wait, wait, stop, please.

[Defense counsel]: Objection, this is not in evidence. I'll request that it be stricken.

THE COURT: I'm going to sustain the objection I think it's an argumentative question.

The trial court immediately advised the jury to disregard the [the] prosecutor's question and the witness's answer.

Knight argues that "the prosecutor's statement that Knight's brother stated that Knight was not sexually abused by his father

constitutes reversible error" because "this was the prosecutor's 'unsworn, unchecked testimony.' " Although we agree that the prosecutor's statement was improper, we disagree that the prosecutor's conduct warrants reversal of Knight's conviction.

In *State v. Marsh,* 68 Haw. 659, 728 P.2d 1301 (1986), we overturned the defendant's second degree robbery conviction because "[t]he prosecutor expressed on at least nine occasions her belief that defense witnesses had lied." In disapproving of the prosecutor's remarks, we noted that "[t]he Supreme Court has observed that a prosecuting attorney's 'improper suggestions [and] insinuations ... are apt to carry much weight against the accused when they should properly carry none.' " *Id.* at 661, 728 P.2d at 1302 (citing *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). In the present case, the prosecutor's insinuation was improper, given that Knight's brother was not available to testify and be cross-examined.

 However, "prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "In determining whether prosecutorial misconduct constitutes reversible error, we have considered [ (1) ] the nature of the misconduct, [ (2) ] the promptness of the curative instruction or lack of it, and [ (3) ] the strength or weakness of the evidence against the defendant." *State v. Senteno,* 69 Haw. 363, 366, 742 P.2d 369, 372 (1987) (citation omitted).

The first factor—the nature of the misconduct—weighs in favor of Knight. We agree that it was improper for the prosecutor to question Knight's credibility using the unsworn, unimpeachable statements allegedly attributable to Knight's brother.

The second and third *Senteno* factors, however, weigh in favor of the prosecution. With respect to a curative instruction, the trial court, as previously stated, promptly instructed the jury to disregard the prosecutor's question and the answer of the witness,[5] and "[a]s a rule, juries are presumed to ... follow all of the trial court's instructions." *Sato v. Tawata,* 79 Hawai'i 14, 21, 897 P.2d 941, 948 (1995) (citations and internal quotations marks omitted). In regard to the third factor, the strength or weakness of the evidence against the defendant, the evidence against Knight, as described above, is overwhelming.

Given the completeness of the court's curative instruction and the strength of the evidence of Knight's guilt, we hold that Knight's substantial rights were not prejudicially affected by the prosecutor's improper reference to Knight's brother's opinion on the issue of sexual abuse, and thus, do not warrant a reversal of his conviction.

## IV.  CONCLUSION

Based on the foregoing, we affirm Knight's conviction of murder in the second degree.

---

5.  Specifically, the trial court stated:
    I'll instruct the ladies and gentlemen of the jury, to disregard the question and the answer of the witness. Ladies and gentlemen of the jury, understand that a question is not evidence itself only the answer of the witness that is evidence, so each time a question[']s asked that may not necessarily if there's an objection, and I sustain it, direct that the question be disregarded, but to the extent the witness has licensed of answered the last question.
    I direct that the witness's testimony be disregarded by the ladies and gentlemen of the jury[.]