976 P.2d 379

STATE of Hawai'i, Petitioner–Appellee,

v.

Roman PEREZ, also known as Raymond Perez, Respondent–Appellant.

No. 20880.

Supreme Court of Hawai'i.

Feb. 8, 1999.

Reconsideration Denied March 4, 1999.

Deborah L. Kim, Deputy Public Defender, on the briefs, for the respondent-appellant, Roman Perez.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for the petitioner-appellee, State of Hawai'i.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, J.

We issued a writ of certiorari to review the published decision of the Intermediate Court of Appeals (ICA) in *State v. Perez*, 90 Hawai'i 113, 976 P.2d 427 (App.1998) (hereinafter the "ICA's decision"). In its application for certiorari, the prosecution asserts that the ICA erroneously vacated Perez's convictions of attempted second degree murder, in violation of Hawai'i Revised Statutes (HRS) §§ 705–500 (1993),[1] 707–701.5(1993),[2] and 706–656 (1993)[3] (Count I), attempted assault in the first degree, in violation of HRS §§ 705–500 and 707–710 (1993)[4] (Count II), and two counts of reckless endangering in the first degree, in violation of HRS § 707–713 (1993)[5] (Counts III and V). Specifically, the prosecution contends that the ICA erred in holding that two of the circuit court's jury instructions—No. 3, pertaining to the defense of extreme mental or emotional disturbance (EMED), and No. 2A, pertaining to reasonable doubt—were prejudicially harmful.

We disagree with the ICA's analysis regarding Jury Instruction No. 3, as set forth in section III.C of the ICA's decision, inasmuch as the ICA mischaracterized the significance of the presence or absence of "self-control" in the determination as to whether a criminal defendant was under the influence of EMED in such a manner as to mitigate the culpability of his or her conduct from murder to manslaughter, pursuant to HRS § 707–702(2) (1993).[6] Accordingly, we hold

1. HRS § 705–500 provides:

 **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
 (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
 (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 707–701.5 provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.... Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656."

3. HRS § 706–656(2) provides in relevant part that "[p]ersons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole."

4. HRS § 707–710 provides in relevant part that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

5. HRS § 707–713 provides in relevant part:

 **Reckless endangering in the first degree.** (1) A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.

6. HRS § 707–702(2) provides:

 In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant

that the circuit court did not err in giving Jury Instruction No. 3. However, we agree with the ICA's analysis regarding Jury Instruction No. 2A, as set forth in section IV of the ICA's decision, and, therefore, affirm the ICA's decision vacating Perez's convictions and remanding for a new trial. We further affirm the ICA's decision in all other respects.

## I. BACKGROUND

The charges against Perez arose from an incident in which he fired shots at his wife, Nova. The Perezes' relationship had evidently become strained when, in mid–1996, Nova became romantically involved with "Nani," a security guard at the Hawai'i Newspaper Agency (the HNA), where Nova was also employed. Perez was aware that Nova had been involved in lesbian relationships in the past, but did not discover until sometime between late 1995 and early 1996 that Nova had become reinvolved. Perez did not object to Nova's lifestyle as long as she "c[a]me home."

However, as the ICA's decision recites,

[a]round the end of June [1996], Nova told [Perez] she wanted to move in with Nani. Although Nova thereafter lived with Nani, she and [Perez] still had sexual relations. [Perez] repeatedly asked Nova to stay the night, but she would reject him, saying, "Oh[,] maybe one of these days." Nova testified that during the week before the subject incident, [Perez] told her that "a person could only take so much before they [sic] snap." He told Nova that "he was not afraid to die, and that one day he was going to do something that she would remember for the rest of her life." [Perez] testified [that] he envisioned shooting himself in front of Nova.

Nova related that[,] on Thursday, July 25, 1996, the day before the incident, she went to [Perez]'s home to check on him. According to Nova, Defendant looked "different, more quiet[,]" and appeared to be "kind of fed up" with asking Nova to come

home. That evening, while Nova was at a party with her co-workers, Defendant paged her three o[r] four times, but Nova did not respond because she knew he was upset.

[Perez] testified that after taking him to cash his check on the Monday before the incident, Nova asked [Perez] for money. He asked Nova about the balance in their joint bank account and she told him there was $300 in the account. He gave her $100, but told her that he needed it returned so he could pay the rent. However, Nova did not come by with the money.

On Thursday, [Perez] went to the bank to withdraw money from the account but learned that there was only six dollars and seventy cents in the account. [Perez] was surprised and angry at this. That night, he repeatedly tried to contact Nova and his anger grew because she would not answer his calls.

Nova testified that[,] at about 10:30 a.m. on Friday, July 26, 1996, she left work to purchase lunches for herself and others. As she walked back to work, she saw [Perez] across the street from her. [Perez] called out to Nova but "something" made Nova continue walking. Nova headed down South Street toward the "K & Y" auto service station located on the corner of South and Queen Streets, but [Perez] followed her. When she turned to look at [Perez], she saw him point a gun at her. Nova ran into the street intersection to escape.

While in the intersection, Nova heard a gunshot and stumbled to her knees. She looked down and saw a small red spot on her shirt, and felt a warm, burning sensation on her right side. Nova stood up and ran towards the station. She heard a second shot and felt something graze her hair. When she reached the station, she cried out for help.

Nova ran to a wall at the rear of the station and tried to climb over it. Two station workers, [Anthony] Rivera and

---

was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reason-

ableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

Mitch Martin, jumped over the wall and tried to pull her over. Nova heard more shots. Because she was unsuccessful in scaling the wall, she ran to the car wash area of the station. Rivera testified that he tried to pull Nova over the wall, but pushed her back down towards the car wash area because she was a "prime target." Rivera dropped down behind the wall and heard a gun shot.

Nova then ran onto South Street, attempting to stop anyone in a vehicle who would take her away. She succeeded in stopping a tow truck driven by [Ronald] Buckingham. She walked around to the passenger side of the truck, opened the door, and got in. Nova told Buckingham that she had just been shot and asked him to take her to the police station. When he heard a gun shot, Buckingham "took off" down Queen Street.

[Perez] testified that he did not sleep on the night before the incident. Thoughts of Nova kept going through his mind. The next day, he planned to go to Nova's work place to talk to her, then to kill himself in front of her. [Perez] caught the bus to [the] HNA, with Nova's gun in his pants pocket. [Perez] saw Nova's car. He sat down to wait for Nova, believing she had to come out for either lunch or to "feed" the parking meter.

He caught sight of Nova as she walked down the street. [Perez] said, "Baby, I getting tired. Stop. I like talk to you [sic]." He took the gun out of his pocket and shot low and to the side of Nova. He did not know that Nova had been hit by the bullet. [Perez] crossed Queen Street and was standing across the street from the station when he fired a second shot to the side of Nova.

At this point, [Perez] further testified that he crossed the street to the service station and lost sight of Nova. He walked past the pumps, mumbling that he did not know why this was happening and he didn't want to hurt anyone.

When [Perez] saw that Nova was boarding a tow truck, he fired another shot. [Perez] testified that he wanted Nova to stop because he thought he would not be able to talk to her if she left in the truck.

When the truck drove away, [Perez] walked back to Nova's car and sat in it. Two police officers came up, blocking the car, and told [Perez] to drop his gun. [Perez] put the gun to his head and pulled the trigger. When nothing happened, he pulled the trigger again, but the gun did not fire. [Perez] exited the car, calling out for the police to shoot him, but they would not do so. [Perez] then walked down Kawaihao Street and through the HNA parking lot where the police lost sight of him. [Perez] was asking an HNA employee for a ride when he was apprehended by the police.

ICA's decision at 116–18, 976 P.2d at 430–32 (some brackets added and some in original).

At the conclusion of the evidentiary portion of the trial, the circuit court instructed the jury regarding the mitigating defense of attempted EMED manslaughter as follows:

If and only if you find, beyond a reasonable doubt, that the Defendant committed the offense of Attempted Murder in the Second Degree as to Nova Perez, you must then determine whether, at that time, he was under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the Defendant's situation under the circumstances of which he was aware or as he believed them to be.

The prosecution must prove beyond a reasonable doubt that the Defendant was not, at the time he attempted to cause the death of Nova Perez, under the influence of extreme mental or emotional disturbance for which there was a reasonable explanation. If the prosecution has done so, then you must return a verdict of guilty of Attempted Murder in the Second Degree. If the prosecution has not done so, then you must return a verdict of Attempted Manslaughter based upon extreme mental or emotional disturbance.

The question of the Defendant's self control, or the lack of it, at the time of the

offense, is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance.

(Citing *State v. Matias,* 74 Haw. 197, 204, 840 P.2d 374, 378 (1992).)

The prosecution subsequently argued in closing argument as follows:

> ... What does it mean to be under the influence of an extreme mental or emotional disturbance?
>
> Okay. The first thing you got to realize is it doesn't just mean you're real angry or real upset or real humiliated. Okay. Because if that were the case, almost any [m]urder would be reduced to a [m]anslaughter. And that's not the law, okay. It doesn't mean you are just under the influence of a strong emotion. You got [sic] to be under the influence of an extreme mental or emotional disturbance. But again, what does that mean?
>
> All right. That's just words. It's difficult. You're going to get a definition to help you.
>
> The question of the defendant's self-control, okay, his self-control, or the lack of it, at the time of the offense. At the time of the offense—so in this case it would be at the time he's doing all that shooting—is a significant factor in deciding whether he was under the influence of extreme mental or emotional disturbance. So the key is this (indicating). Okay.
>
> Now, if you find that he was under self-control, that he had self-control, that he had control of himself while he's doing this stuff, then he's not under the influence of extreme mental or emotional disturbance. That's what it means. So consider his actions. Consider his actions while he's doing all this shooting.
>
> First of all, he brings the loaded gun. Okay. He didn't just find it there. He brings it to the scene.
>
> He lies in wait. He waits for her. He's patient. He doesn't just go storming in there to confront her. And he knows where she works. Okay. He's not out of his mind with anger or grief or humiliation. He controls himself. He waits.
>
> Again, she come out. Does he run right up to her, confront her right away, pull that gun, start yelling and screaming at her? No. He waits. He waits and he confronts her on his own terms. After she's gone all the way down and come all the way back.
>
> The shooting itself, when he pulls that gun and starts shooting at her, does he just pull off five rounds, bang, bang, bang, bang, bang, because he's so angry at her, so upset, he can't help himself? He wants to kill her so bad, he just fires off those rounds?
>
> No, his rounds are single-spaced rounds, aim, fire, aim, fire. She gets out of his sight, stops firing, puts the gun to his side, walks after her to find her again. Finds her at the wall, aim, fire. She's still running. She's running behind the car wash. Again, does he start squeezing rounds off? No. Keeps walking right after her. Gun down, walks right after her calmly.
>
> Every witness who testifies to his conduct says he was calm. He never even breaks into a run. Is he yelling and screaming out of his head, swearing at her? No, he's not saying anything. The most that Eric Nakashima said is he heard him maybe mumbling something, but the other witnesses say he wasn't saying anything.
>
> Again, she runs for the tow truck, aim, fire. He's totally in control of that situation. He's got the gun and he's certainly not—he certainly hasn't lost any control over himself.
>
> After the shooting, what does he do? Again, does he just go running into the street yelling and screaming? After all, she got away from him. No, what does he do? He has enough presence of mind and self-control to conceal the gun again. He told you himself he did that. He puts the gun away and he calmly walks all the way back up South Street headed for the car. He doesn't start running towards Lex Brodie after her. He heads for the car. He knows it's over. He's failed. He heads for the car. He gets in the car. He starts the car up because he wants to get out of there. He's escaping.

. . . .

Okay. He gets in the car and it's only when he's cut off, it's only when the cops come and they cut him off that he does hold that gun to his head and pull the trigger twice. But after he does that, what does he do? . . . Is he out of his mind at that point? Does he rush the cops? Does he point the gun at them? He says he did, but you really believe he did?

You heard Officer Sugimoto on the stand. Officer Sugimoto is drawn down on him. I asked Officer Sugimoto: You think you might have had to kill him? He said: Yeah, for sure. Why didn't you fire? Well, you know, based on my training and my experience, it didn't seem to ever get to that point.

I asked him: What would have made you fire? What if he pointed the gun at you? No doubt about it, they would have killed him. Of course they would have killed him. What if he rushed at them? Again, they would have had to fire. Did he do either of those two things? No. He wants to have you believe he's so—he just wants to die, he just wants them to kill him. You know, you're all adults. All it would have taken was for him to have pointed that gun at them and they would have blown him away. All it would have taken was for him to rush at them and they would have blown him away.

He didn't do either. What does he do? Puts the gun down. He doesn't go running crazily down Kawaihao Street. Where does he head? Right here.

He himself told you he knows this area. He knows the print shop. He knows the mailing place where his wife works. He knows it very well. He gets out into the parking lot. Again, he said he had three to four minutes. I don't know, do you really believe that? But he had some [ ] time out there before the cops found him.

What does he do? Puts the gun away again. Why does he do that? Because he knows if he walks up to Beryl Hinau and asks her for a ride with a gun in hand, she's going to completely freak out and he's not going to be able to get out of there. She's not going to give him a ride anywhere. So he puts the gun back. He conceals it again. He's under control of himself throughout this entire incident.

He asks her for a ride and she says: Yeah, okay, I'll give you a ride. It's only then that the cops arrive and finally take him down. And when they do get there, he pulls the gun out again, or tries to. He didn't lose control of himself throughout this entire incident. He's not raving. He's not yelling and screaming. He's not squeezing off rounds all over the place. . . .

. . . [I]f you believe the State's case and you believe, for example, that he was under control of himself throughout this incident, that's enough. That's proof beyond a reasonable doubt that he was not under the influence of extreme mental or emotional disturbance during the shooting.

After his conviction, Perez was sentenced to imprisonment for life with the possibility of parole in connection with his conviction of Count I, imprisonment for ten years in connection with his conviction of Count II, and prison terms of five years each in connection with his convictions of Counts III and V, together with mandatory minimum terms of twenty years, ten years, and five years, respectively. Each of the foregoing terms was ordered to be served concurrently.

On appeal, Perez argued that the circuit court had committed reversible error in (1) giving certain jury instructions and (2) failing to admonish the prosecution or to issue a curative instruction when the prosecution allegedly raised the issue of Perez's punishment in its closing argument. The ICA agreed that the circuit court had incorrectly instructed the jury pertaining to (1) the definition of proof beyond a reasonable doubt and (2) the significance of self-control in determining whether Perez had acted under the influence of EMED so as to mitigate the charge of attempted murder to attempted manslaughter. ICA's decision at 125, 128–29, 976 P.2d at 439, 442–43. Accordingly, the ICA vacated Perez's convictions and remanded the matter to the circuit court for a new trial. *Id.* at 129, 976 P.2d at 444.

Subsequently, the prosecution applied to this court for a writ of certiorari, contesting the ICA's holdings that the aforementioned jury instructions were prejudicially erroneous.

## II. *STANDARD OF REVIEW*

 " 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading,' " *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio,* 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)).... *See also State v. Hoey,* 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994).

" '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " *State v. Pinero,* 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) ... (quoting *Turner v. Willis,* 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432] (1991)[.]

[*State v.*] *Arceo,* 84 Hawai'i [1,] 11–12, 928 P.2d [843,] 853–54 [ (1995) ] (quoting *State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912,

917, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995) (some citations omitted) (brackets in original) (emphasis deleted)); *see also State v. Loa,* 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996); *State v. Robinson,* 82 Hawai'i 304, 310–11, 922 P.2d 358, 364–65 (1996).

*State v. Maumalanga,* 90 Hawai'i 58, 62–63, 976 P.2d 372, 376–377 (1998) (quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)) (some brackets added and some in original).

## III. *DISCUSSION*

 In holding that the circuit court erred in instructing the jury that the presence or absence of self-control "is a significant factor in deciding whether [a defendant] was under the influence of extreme mental or emotional disturbance," the ICA first traced the historical development of the principles embodied in HRS § 707–702(2), *see supra* note 6, and Hawai'i case law interpreting that statute. ICA's decision at 121–23, 976 P.2d at 435–37. While it acknowledged that the concept of "EMED manslaughter" found its roots in the English common law, which defined voluntary manslaughter "as springing from 'passion ... tending to disturb the judgment and mental faculties, and weaken the possession of self-control,' " *Id.* at 122, 976 P.2d at 436 (quoting *State v. Russo,* 69 Haw. 72, 77, 734 P.2d 156, 159 (1987) (quoting *King v. Greenwell,* 1 Haw. 146, 149 (1853))) (ellipsis points in original), the ICA expressed the views that "the concept of lack of self-control as derived from common-law manslaughter is already subsumed in the penal code defense of emotional disturbance" and that "the 'criterion of a general weakening of self-control' ... was not the same as but rather 'something approximating the Code's [already] more general approach to mental and emotional extenuation' " ICA's decision at 122–23, 976 P.2d at 436–37 (quoting Commentary on HRS § 707–702) (emphasis deleted) (brackets in original).[7] The ICA further reasoned:

7. *But see State v. Holbron,* 80 Hawai'i 27, 34, 904 P.2d 912, 919 ("We thus inherit, with minimal modifications, several enduring principles regarding manslaughter from the English common law: (1) manslaughter may be either 'voluntary' or 'involuntary,' but not both; (2) voluntary man-

[T]he emotional disturbance defense *admits* that the defendant intentionally or knowingly caused the death of another or attempted to do so, and therefore, that the defendant possessed the requisite "self-control" to commit or attempt murder. Commission of such acts is, in effect, the factual and legal prerequisite for raising such a defense, and thus not the basis for defeating it. As the defense argues, "[i]f this [ (self control in committing the acts) ] were the criteria for assessing [the emotional disturbance defense,] then no defendant would be entitled to [its] benefit ... since the mitigation presumes the wherewithal to have committed a murder." The question is not whether the defendant had sufficient self-control at the time to commit murder or to attempt it, but whether, when the acts were committed, the defendant was *influenced* by the requisite mental and emotional disturbance.

As [Perez] indicates, he does not dispute the relevance of "all aspects of a defendant's conduct," but that the prejudice inherent in the instruction was the failure to provide "any ... explanation [of] ... 'self[-] control'" as it related to the defense. We believe that an instruction that merely singles out "self-control" for consideration by the jury is prejudicially insufficient and misleading.

. . . .

We see little to be accomplished, then, in adding an instruction on "self-control" to a standard instruction which already embodies the principle that the "weakening of self control" is "approximat[ed]" in the extenuating circumstances of mental and emotional disturbance referred to in HRS § 707–702(2). Moreover, the solitary reference to self-control may only tend to mislead or confuse the jury, since the emotional disturbance defense was intended to be "more general" and hence broader in its application than common law manslaughter. Commentary on HRS § 707–702; *[State v.] Dumlao,* 6 Haw.App. [173,] 184,

715 P.2d [822,] 830[, *cert. denied,* 68 Haw. 692, 715 P.2d 822 (1986) ]. Finally, and in any event, we do not discern in [the instruction at issue] language which would guide the jury on how self-control "relates to the extreme emotional disturbance component of HRS § 707–702(2)." *[State v.] Matias,* 74 Haw. [197,] 209, 840 P.2d [374,] 380 [ (1992) ]. Consequently, we conclude that [the instruction] was prejudicially erroneous . . . .

ICA's decision at 123–24, 976 P.2d at 437–38 (some brackets added and some in original) (emphasis and ellipsis points in original) (footnote omitted).

The prosecution, in its application for certiorari, urges that the ICA's analysis was flawed because,

[a]lthough the ICA appears to be of the opinion [that] "intentional or knowing" is synonymous with "self-control," with respect to the mitigating defense, this Court has indicated otherwise:

The ... mitigating defense[ ] has been characterized as voluntary manslaughter *because it involves the intentional or knowing killing of another while under the influence of a reasonably induced extreme mental or emotional disturbance causing a temporary loss of normal self-control.* But for the presence of these extenuating circumstances the intentional or knowing killing of another human being would be murder[.]

*State v. Holbron,* 80 Hawai'i 27, 42, 904 P.2d 912, 927 (1995) (emphasis omitted and supplied); *accord* ... *Matias,* 74 Haw. [at] 204–06, 840 P.2d [at] 378 . . . . Thus, the law recognizes that, in the voluntary manslaughter context, whereas one intends to kill, the killing is done while under the influence of an extreme mental or emotional disturbance, which [results in] "a temporary loss of normal self-control." Despite the ICA's inability to discern how [the instruction at issue] is relevant in assessing the mitigating defense, this Court, on

slaughter arises out of a purposeful but 'hasty' act that would constitute murder but for the absence of 'malice' and the presence of 'provocation,' 'passion,' or 'heat of blood,' which is unsubsided by 'sufficient cooling-time'; [and] (3)

involuntary manslaughter arises out of an unjustified and unintentional act of homicide[.]"), *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995).

the other hand, has indicated that the [n]exus is readily apparent. . . .

In *State v. Dumlao*, 6 Haw.App. 173, 715 P.2d 822 (1986), the ICA held that extreme mental or emotional disturbance "was meant to be understood in relative terms as referring to *a loss of self-control due to intense feelings." Dumlao*, 6 Haw.App. at 180, 715 P.2d at 828 (emphasis supplied; citation omitted). In ruling that the Hawai'i legislature obviously intended this to be the case in adopting the Model Penal Code, the ICA quoted a passage from *People v. Shelton*, 88 Misc.2d 136, 149, 385 N.Y.S.2d 708, 717 (1976):

> [T]hat extreme emotional disturbance is the emotional state of an individual who: (a) has no mental disease or defect that rises to the level established by Section 30.05 of the Penal Law; and (b) is exposed to an extremely unusual and overwhelming stress; and (c) has an extreme emotional reaction to it, *as a result of which there is a, loss of self-control* and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.

*Dumlao*, 6 Haw.App. at 181–82, 715 P.2d at 829 (emphasis supplied; footnotes omitted).

In *State v. Seguritan*, 70 Haw. 173, 766 P.2d 128 (1988), subsections (b) and (c) of the above *Shelton* passage were given as an instruction with respect to the mitigating manslaughter defense. The Hawai'i Supreme Court affirmed that part of the instruction which denoted the emotional state of an individual who "1) is exposed to an . . . unusual and overwhelming stress, and 2) has an extreme emotional reaction to it, *as a result of which there is a loss of self control* and reason is overborne by intense feelings such as passion, anger, distress, grief, excessive agitation or other similar emotions." *Seguritan*, 70 Haw. at 174, 766 P.2d at 128–29 (emphasis supplied). The court ruled improper the use of the modifier "extremely" as used in subsection 1) above, *i.e.*, "is exposed to an *extremely* unusual and overwhelming stress[.]" *Id.* (emphasis supplied).

In *Matias, supra*, the State's expert psychologist opined that the defendant was not under the influence of an extreme mental or emotional disturbance when he shot and killed his victim because there were significant indications he had "maintained a relatively high degree of self-control 'before, during, and after' the commission of the crime." *Matias*, 74 Haw. at 200–01, 840 P.2d at 376. On appeal, the defendant argued that the opinion regarding his self-control was not relevant to the mitigating defense. *Matias*, 74 Haw. at 201–02, 840 P.2d at 377.

The Hawai'i Supreme Court held that "[t]he applicable case law leaves no doubt that *the question of a killer's self-control, or lack of it,* at the time of the killing *is a significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance such that his conduct would fall under HRS § 707–702(2)." Matias*, 74 Haw. at 204, 840 P.2d at 378 (emphasis supplied). The court reviewed the applicable case law, and cited with approval to *Dumlao, supra*, to *State v. Russo*, 69 Haw. 72, 77, 734 P.2d 156, 159 (1987) (A person who "kill[ed] another without malice aforethought, under the sudden impulse of passion, excited by provocation or other adequate cause, by the party killed, of a nature tending to disturb the judgment and mental faculties, and weaken the possession of self-control of the killing party, [was] not guilty of murder, but manslaughter."), and to *State v. Pinero*, 70 Haw. 509, 778 P.2d 704 (1989). *Matias*, 74 Haw. at 204–06, 840 P.2d at 378. The *Matias* Court stated:

> Finally, in *State v. Pinero*, 70 Haw. 509, 778 P.2d 704 (1989), this court again commented on HRS [§ ] 707–702(2) and indicated that the loss of self-control on the part of the killer was at the core of the court's definition. We state, "[t]he offense, more accurately the mitigating defense, has been characterized as 'voluntary manslaughter [because it] involves the intentional [or knowing] killing of another while under the influence of a reasonably induced [extreme mental] or emotional disturbance . . . *caus-*

*ing a temporary loss of normal self-control.*[' "]

*Matias, supra* (emphasis in original; citation omitted). This Court concluded, "Based upon the foregoing clear authority, [the defendant] is manifestly mistaken in arguing that the question of self-control on the part of the killer is not relevant to the issue of whether a murder should be mitigated to manslaughter under HRS [§ ] 707–702(2)." *Matias*, 74 Haw. at 206, 840 P.2d at 378; *accord Holbron, supra*, and *State v. Knight*, 80 Hawai'i 318, 326, 909 P.2d 1133, 1141 (1996). It is apparent from a reading of this Court's decisions that an actor's self-control, or lack thereof, is an important criteri[on] in assessing whether the actor was under the influence of an extreme mental or emotional disturbance. Consequently, it was not error to instruct the jury that self-control was a "significant" factor in assessing whether the mitigating defense applied to [Perez].

 The prosecution's argument demonstrates the better understanding of the mitigating EMED defense. It is insufficient for a criminal defendant merely to allege that he or she was experiencing emotional distress at the time of the charged offense. As this court noted in *Seguritan*, the mitigating EMED defense "focuses ... on the defendant's *reaction* to the stress," *i.e.*, on whether the defendant's *reason* was "overborne." 70 Haw. at 174, 766 P.2d at 129 (emphasis added). The key distinction, therefore, is between the "intentional" or "knowing" character of conduct, on the one hand, and its "controllability," on the other. *Knight*, in which the defendant appealed his second degree murder conviction, provides an apt illustration. *Knight*, 80 Hawai'i at 319, 909 P.2d at 1134. In that case, the defendant was accused of killing a gay man after an alleged homosexual encounter in the victim's apartment:

> At trial, Knight essentially argued that, because he was sexually and emotionally abused as a child by his father, he became homophobic; therefore, his encounter with homosexuality caused him extreme mental or emotional disturbance, which, in turn caused him to kill [the victim]. Conse-

quently, Knight maintained that his crime should be reduced to manslaughter by virtue of an extreme mental or emotional disturbance for which there was reasonable explanation (EMED manslaughter). The only evidence proffered by Knight with respect to his claim of child sexual abuse was his own testimony that his father had sexually abused him at the ages of five, six, and eleven. With respect to his claim of emotional abuse, Knight testified that, because his father objected to Knight's relationship with his mother, his father had called him a mama's boy, a sissy, and a wimp. Knight's mother corroborated Knight's testimony that he was emotionally abused by his father.

> At the close of evidence, the trial court instructed the jury on the law regarding second degree murder and EMED manslaughter. The trial court refused, however, to instruct the jury "on the included offense of reckless manslaughter," as provided for in HRS § 707–702(1)(a) (1993).... [T]he jury adjudged Knight guilty of murder in the second degree.

> ....

> [On appeal,] Knight contend[ed] that an instruction on reckless manslaughter should have been presented to the jury because, although "the primary defense in [his] case was extreme mental or emotional disturbance."

> [t]here was evidence adduced from which the jury could conclude that [Knight] was, because of his history of physical, emotional and sexual abuse by his father, sensitive to sexual contact with men. And once he was in [the victim's] apartment, and realized that [the victim] was trying to seduce him, [Knight] should have recognized that the strong, conflicting emotions that were rising up within him might lead to violence. By staying with [the victim] in his apartment, and not leaving earlier, [Knight] consciously disregarded a[ ] substantial and unjustifiable risk that he was allowing [the victim] to engage in conduct that angered [him] to the point of violence.

> (Emphasis added.)....

> ....

Although Knight's own testimony suggests otherwise, even if we were to assume, *arguendo,* that Knight was aware of his homophobia prior to the moment he "whigged out" and killed [the victim], Knight's decision to remain in the apartment, notwithstanding his homophobia, was not the "cause" of [the victim's] death. Rather, the "cause" of [the victim's] death was the knife wound to [his] throat, which Knight admits inflicting. Knight's "whigged out" theory does not suggest that the slashing of [the victim's] throat (the cause of death) occurred through Knight's recklessness in approaching the victim while holding a knife, *see [People v.] Mocaby,* [194 Ill.App.3d 441, 141 Ill.Dec. 486, 551 N.E.2d 673 (1990)], or that he consciously disregarded a substantial and unjustifiable risk that slashing [the victim's] throat would cause [his] death. In effect, *Knight does not argue that his actions were unintentional, but rather that they were uncontrollable. Such a defense is encompassed under EMED manslaughter, that is, the intentional killing of another "while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control."* [State v. Holbron,] 80 Hawai'i [27,] 42, 904 P.2d [912,] 927 [(1995)]. As previously indicated, the jury in finding Knight guilty of second degree murder, necessarily determined either that *Knight experienced no loss of control,* or, if he did, that it was not, in fact, reasonable.

*Id.* at 322–24, 909 P.2d at 1137–39, 1141 (some brackets added and some in original) (some emphases added, some omitted, and some in original) (footnotes omitted).

Evidence of a criminal defendant's state of mind may take a variety of forms. There may be expert testimony regarding the matter, as in *Matias.* State of mind may be established by way of the defendant's own testimony, as in *Knight.* Or it may, as in the present case, be inferred via evidence of the defendant's conduct and demeanor at the time of the charged offense. *See State v. Mitsuda,* 86 Hawai'i 37, 44, 947 P.2d 349, 356 (1997) (quoting *State v. Batson,* 73 Haw. 236, 254, 831 P.2d 924, 934, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992))

("[G]iven the difficulty of proving the requisite state of mind by direct evidence in criminal cases, '[w]e have consistently held that ... proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient.... Thus, the mind of an alleged offender may be read from his acts, conduct and inference fairly drawn from all of the circumstances.'" (Some brackets added and some in original.))

■ Perez contends that "[t]he prosecutor ... exploited the fact that the instructions failed to adequately define 'self-control' by arguing that since there was no evidence that Mr. Perez exhibited any hysteria or stereotypical loss of control, Mr. Perez was not under the influence of EMED." On the record before it, however, the jury could legitimately have inferred that Perez's conduct was inconsistent with his claim of being "under the influence" of EMED. That being the case, the prosecution was justified in urging it to do so. It is undoubtedly true, as Perez asserts, that, under some circumstances, persons experiencing a loss of self-control, resulting from being under the influence of an extreme mental or emotional disturbance, may behave in an outwardly calm or even semi-catatonic state. That being the case, a defendant is free to adduce expert testimony or other evidence pertaining to his or her state of mind offense in order to rebut the prosecution's contention that outward calm was evidence of self-control. Such testimony was, in fact, adduced in *Matias,* 74 Haw. at 200, 840 P.2d at 376. Perez, however, apparently opted not to do so here. Irrespective of the wisdom of Perez's decision in retrospect, it does not constitute reversible error. *See State v. Richie,* 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998) (quoting *State v. Aplaca,* 74 Haw. 54, 70, 837 P.2d 1298, 1307 (1992)) ("'[T]he decision whether to call witnesses in a criminal case is normally a matter of judgment of counsel, and, accordingly, will rarely be second-guessed by judicial hindsight.'")

This court noted in *Russo* that to hold that evidence that an individual "would coolly seek out and intentionally kill the owner and

a patron of a bar he once frequented and justify the acts on grounds that habitués of the establishment were 'leaving me out' of their activities ... furnishes a basis for mitigating the offense of murder to manslaughter 'would [be to] undermine the normative message of the criminal law' communicated via HRS §§ 707–701 and 707–702." 69 Haw. at 79–80, 734 P.2d at 160 (citing Model Penal Code § 210.3 comment 5). Similarly, we believe that to hold that evidence that an individual who "obtained a loaded gun, went to [his wife's] work place, waited for her to show up, shot methodically, put the gun away and walked away," in and of itself, furnished a basis for mitigating the offense of attempted murder to attempted manslaughter, as Perez presently argues, " 'would [likewise] undermine the normative message of the criminal law' communicated via HRS §§ 707–701 and 707–702."

The appellate courts of this jurisdiction have observed on many occasions 'that "EMED manslaughter ... is [ ] the *intentional* killing of another 'while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control.' " *Knight,* 80 Hawai'i at 326, 909 P.2d at 1141 (quoting *Holbron,* 80 Hawai'i at 27, 904 P.2d at 927); *see also Holbron,* 80 Hawai'i at 45, 904 P.2d at 930 ("[I]t is in HRS § 707–702(2) ... that the legislature has codified the common law of "voluntary manslaughter."); *Matias,* 74 Haw. at 204, 840 P.2d at 378 ("[A] killer's self-control, or lack of it, at the time of the killing is a significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance such that his conduct would fall under HRS § 707–702(2)."); *Dumlao,* 6 Haw.App. at 181–82, 715 P.2d at 829 ("[An] extreme [mental] or emotional disturbance is the emotional state of an individual, who ... has an extreme emotional reaction to [an unusual and overwhelming stress] as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.") We therefore hold that the circuit court did not err in the present matter by instructing the jury consistently therewith.

## IV. *CONCLUSION*

Because we agree with the ICA that Jury Instruction No. 2A, defining reasonable doubt, was prejudicially misleading, we affirm the ICA's decision vacating Perez's convictions and remanding the present matter to the circuit court for a new trial. However, we hold that the circuit court did not err in giving Jury Instruction No. 3, pertaining to the role of self-control in determining whether a defendant is acting under the influence of EMED in such a manner as to reduce attempted murder to attempted EMED manslaughter. In all other respects, we affirm the ICA's decision.